MARGARET RUDIN, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 38567

April 1, 2004                                              86 P.3d 572

---

*Marcus D. Cooper,* Public Defender, and *Craig D. Creel,* Deputy Public Defender, Clark County, for Appellant.

*Brian Sandoval,* Attorney General, Carson City; *David J. Roger,* District Attorney, *James Tufteland,* Chief Deputy District Attorney, and *Christopher J. Owens,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, AGOSTI, J.:

This is an appeal from a judgment of conviction on Count I, unauthorized surreptitious intrusion of privacy by listening device and Count II, murder with use of a deadly weapon. Appellant Margaret Rudin argues that she is entitled to a new trial because: (1) the district court abused its discretion by admitting unreliable expert testimony, (2) the State deprived her of her right to a fair trial by engaging in repeated instances of prosecutorial misconduct,

(3) the district court deprived her of her right to a fair trial by engaging in repeated instances of judicial misconduct, and (4) one of her trial counsel was unable to adequately prepare for trial depriving her of her right to a fair trial. We conclude that Rudin's arguments are without merit and, accordingly, we affirm the judgment of conviction.

## FACTS

The victim, Ronald (Ron) Rudin, and the appellant, Margaret Rudin (Rudin), were married in September 1987. Ron owned a realty company that was located in a strip mall which he also owned. Rudin and Ron shared a private residence located directly behind the mall.

According to Rudin's sister, Dona Cantrell, Rudin would often complain that Ron was stingy, and that Rudin hoped he would die from his poor health. In 1991, following an altercation between Rudin and Ron's employees, Ron forbade Rudin from entering his realty office before 5:00 p.m. Around this same time, Ron also removed a phone line shared between his office and his residence after his employees claimed that Rudin had been eavesdropping on their conversations. After Ron terminated the shared phone line, Rudin and Cantrell secretly placed hidden listening devices in Ron's office. These devices transmitted a signal to a receiver and recorder that Rudin kept in the residence and allowed her to eavesdrop undetected.

According to Ron's attorney, Patricia Brown, Ron had characterized Rudin, who was a forty-percent beneficiary of his trust, as becoming increasingly "vicious and violent." Accordingly, in 1991, Ron executed a secret directive to the trustees of his estate that they take "extraordinary steps" to investigate the cause of his death if he died by "violent means." The directive also provided that any beneficiary who caused his death was not to receive any assets from his estate. In 1993, Ron increased Rudin's share in his trust to sixty percent.

In 1994, eavesdropping with the aid of her listening devices, Rudin discovered that Ron was involved in a romantic affair with a woman who was also a former employee. During this same time period, Rudin developed a close relationship with Yehuda Sharon.

On the evening of December 18, 1994, a tenant at Ron's strip mall stated that she spotted Ron walking towards Rudin's antique store which was also located at the mall. Around 8:10 p.m., a friend of Rudin's testified that she called the residence and spoke to Ron, who told her that Rudin was not there. Rudin claims that she called Ron from her cellular phone between 8:30 and 9:30 p.m. Her cellular phone records, however, contain no record of this call. Rudin claims that after the call she worked late at her

antique store until about 1:15 a.m. on December 19, 1994. A friend of Rudin's, Jeanne Nakashima, testified that she was with Rudin at the antique store from approximately 9:15 p.m. until 12:45 a.m.[2] At 2:20 a.m., Rudin stopped by the office of Carol Kawazoe, who was working late with her husband at her tax preparation office, which was also located at the strip mall. Kawazoe, who had never previously met Rudin, testified that Rudin introduced herself and spent no less than thirty minutes making pleasant conversation with Kawazoe and her husband. According to Rudin, she then returned home and discovered that Ron and his vehicle were gone. Rudin claims that she was not worried because she believed that Ron was probably upset that she had been working so much and had likely decided to go out by himself.

On Monday morning, December 19, 1994, Ron did not appear at the realty office although he ordinarily opened the office on Monday mornings. One of Ron's employees called his residence and received no answer.

On the evening of December 19, 1994, Yehuda Sharon, Rudin's close friend, rented a large passenger van from a rental car agency in Las Vegas. According to Sharon, he had rented the van to pick up a shipment of holy oils from a business in Santa Fe Springs, California. Sharon had directed the rental car agency to remove the back passenger seat from the van. Sharon returned the van on December 23, 1994, with 348 miles logged. Sharon told investigators that he drove to California on December 22, 1994, but that he never reached his planned destination because he decided to turn around midway due to a trucker's comment that it was raining in California.

On December 20, 1994, two of Ron's employees went to a local police station to report Ron's disappearance. The police officer contacted Rudin and explained that she would accept the report made by the two employees unless Rudin was going to make a report. Rudin made a missing persons report early that afternoon.

On December 21, 1994, Rudin hired a day laborer, Augustine Lovato, to clean some stains on the carpet in front of her washer and dryer. According to Lovato, the stains had already been partially cleaned and appeared to be a dark brown substance.

On December 22, 1994, police detectives interviewed Rudin at her antique store and, with Rudin's permission, performed a cursory search of the residence. The search revealed nothing unusual. Rudin's sister, Cantrell, testified that on or about that same day she visited Rudin at Rudin's residence. She noticed that Rudin was reviewing Ron's will and trust documents, which Rudin had retrieved from Ron's realty office the previous Monday, December 19, 1994.

---

[2] Rudin never mentioned Nakashima in her original statement to the police.

On December 23, 1994, Ron's car was discovered parked in an alley behind the Crazy Horse Too Saloon in Las Vegas. The car was locked, and the police retrieved two sets of keys to the vehicle from the car's interior. The police also noted that dirt had been tracked onto all four floorboards of the car. Upon further investigation, several latent fingerprints were lifted from the vehicle, none of which belonged to Ron or Rudin.

On the evening of December 25, 1994, Rudin hired a locksmith and gained entry into Ron's realty office. According to Cantrell, she and Rudin spent several hours in Ron's office gathering various documents that Rudin said she would need, including numerous financial documents, documents relating to the suicide of Ron's former wife and documents reflecting that a family member of Ron's former wife had years earlier made a death threat against Ron.

On December 29, 1994, Cantrell was working with Rudin at her antique shop when Detective Frank Janise entered the store and asked to speak with Rudin. After speaking with Rudin, Detective Janise approached Cantrell in another part of the store. According to Cantrell, she was speaking with Detective Janise when Rudin approached them and told the detective, "Ron always wears black pants and Ron always wears black boots." Cantrell testified that Rudin later indicated to Cantrell that Rudin had "caught" herself talking about Ron in the past tense and had made a point of going back to speak with the detective.

Cantrell also claimed that, around this same time, she helped Rudin gather several documents from inside an antique desk in Rudin's antique shop. The documents included a notebook with an entry in Rudin's handwriting itemizing Ron's total assets. Additionally, Cantrell stated that she retrieved a certificate from a firearm safety course that Rudin had completed in November 1993, along with a handwritten note stating that "it's you or him; get him first."

On January 12, 1995, Rudin hired Lovato to help her turn the master bedroom into an office. Lovato dismantled the bed, which had been stripped of its bedding, and removed the mattress and bedspring. Lovato claimed that Rudin instructed him to remove all the furniture from the room and cut out the 9- by 12-foot area of carpeting directly underneath the bed. According to Lovato, as he cut the carpet he noticed dark reddish brown stains and a strong odor that he likened to the odor of his dogs after they had been chewing on rabbits. After he began working on the carpet, Lovato claims that Rudin told him that she had gotten good news from her attorneys and, therefore, he should remove all of the carpet because she was going to recarpet the entire master bedroom. While removing the carpet, Lovato noticed several reddish brown splatters on a

large glamour shot of Rudin that was hanging over the area where the bed had been.

Lovato testified that when he returned to do some additional work several days later, the master bedroom was newly carpeted, and the glamour shot portrait had been moved to the guest room. The reddish brown splatters were no longer on the photo. Lovato also claimed that at some point he heard a gurgling sound coming from the master bathroom, where he observed a reddish brown blob bubbling out of the bathtub drain. Lovato testified that Rudin returned to the residence with a U-Haul truck, into which he loaded the mattress, box spring and a cardboard wardrobe closet. Later, at Rudin's direction, he unloaded the items in an alley and abandoned them there.

That same day, Rudin asked Lovato to mail a package addressed to her mother. Lovato forgot to mail the package, and ultimately turned it over to the police. After obtaining a search warrant, police opened the package and discovered several personal items inside, including a postcard from Israel signed ''Love, Yehuda,'' a photo of Yehuda Sharon and a handwritten letter from Rudin to her mother containing the message, ''Please hold on to my Ye.''

On the night of January 21, 1995, fishermen discovered charred remains near Nelson's Landing at Lake Mohave. Only a skull and 500 grams of bone matter remained. Police investigators were ultimately able to positively identify the remains as Ron's by consulting his dental records. Investigators identified the cause of death as multiple gunshot wounds to the head. Investigators also recovered three .22 caliber bullets from inside Ron's skull as well as two bullet fragments. Detectives met with Rudin on January 23, 1995, to notify her that they had identified Ron's remains. According to the detectives, Rudin displayed no visible signs of emotion other than rubbing her knuckle into her eye.

Found with Ron's remains were the burnt remnants of a large steamer trunk. Cantrell told investigators that she had seen a similar trunk in Rudin's antique shop during the shop's grand opening. Cantrell claimed that she never saw the trunk again after that date. Police also interviewed an antique dealer, Bruce Honabach, who recalled selling such a trunk to Rudin in 1994.

On the evening of January 27, 1995, the police, armed with a warrant, searched Rudin's residence and discovered in the former master bedroom, minute splatters of a blood-like substance on the walls, the ceiling, an outlet cover and an electronic control device. The police also discovered blood-like splatters on the box spring that had been recovered from the alley and on the glamour shot portrait, which the police had recovered from a frame store which, at Rudin's request, was placing new glass on the portrait.

While the police were searching Rudin's residence, Rudin was observed by police surveillance as she drove towards her residence and then as she drove away from the area upon her apparent observation of several police squad cars. The police followed Rudin as she left the area. Rudin stopped at a nearby convenience store, where she made several phone calls. Later, Rudin went to Cantrell's residence. Cantrell claims that Rudin told her that the police were looking for a trunk, a gun and a glamour shot portrait. After visiting with Cantrell, Rudin drove to Sharon's residence where she remained for nearly two hours. The police then observed Rudin and Sharon leave the house and followed them to Stateline. When Rudin and Sharon reached the California border, police officers contacted the Los Angeles Police Department, which surveilled Rudin until the next morning when she boarded a flight to St. Louis, Missouri. Rudin did not return to Nevada until law enforcement officers in Massachusetts apprehended her and she was extradited to Nevada in 1999.

On July 21, 1996, a scuba diver discovered a .22 caliber Ruger handgun while diving near Pyramid Island at Lake Mead. The gun was wrapped in several plastic bags that were secured with rubber bands and so was well preserved. The handgun had a sound suppressor attached to it. Police subsequently learned that the gun had been registered to Ron in 1980. According to records obtained from the Bureau of Alcohol, Tobacco and Firearms, Ron had reported the items missing in October 1988. In particular, Ron sent a letter to the Bureau, stating that he suspected that his wife had packed his gun in her belongings in anticipation of her move due to a pending divorce. Rudin and Ron had apparently separated or considered divorce at several points during their marriage.

On April 17, 1997, Rudin was indicted by a Clark County grand jury for the crimes of unauthorized surreptitious intrusion of privacy by listening device, murder with use of a deadly weapon and accessory to murder. A warrant was issued for Rudin's arrest. Law enforcement officers in Massachusetts eventually apprehended Rudin in November 1999. After officers asked Rudin whether she knew why she was being arrested, she responded, ''Yes. This is about Las Vegas, isn't it?''

On March 31, 2000, Rudin was arraigned in the Eighth Judicial District Court and pleaded not guilty to all counts. Rudin was initially represented by the Clark County Public Defender's Office. She eventually retained the services of a private attorney, Michael Amador, who claimed to be representing Rudin on a pro bono basis. On February 20, 2001, the district court, in order to avoid further delays, appointed attorney Thomas F. Pitaro to assist Amador.

Trial commenced on March 2, 2001. Following the State's opening statement, Michael Amador delivered a lengthy opening statement which included the following remarks:

This is a great day, in a lot of different ways. Some days are difficult; some days we hear bad news or we go through a difficult time, but every day, every day, depending on how you look at it, with a few exceptions, can be a celebration.

. . . .

This is a great today for me. This is a culmination of a career. The people in this case, we are not strangers; we know each other. Chris and I were sworn in as deputy DAs the same day. And I congratulate Chris on a presentation that was organized and well thought out, the best money can buy. It was really good.

. . . .

If you want to know an opinion about me, I guarantee you'll find some, different ones from different people. Not many people know me. I have few close friends, like Ronald Rudin had few close friends.

. . . .

I could be a wonderful, caring father, coaching soccer, helping kids with their homework, which I did the first time I got married when they were young.

Then another day, I might scream at someone, yell at them for—I don't know—for asking me some question, because I was too busy and I was thinking of something else.

. . . .

The difficulty I have at times is communicating to people. I have to look at it and talk to other people and they will bring me back down to earth and say: Mike, what are you trying to say? What are you trying to get across?

. . . .

I reviewed again this morning my opening statement and threw most of it away. I don't know, maybe it's just something I do.

Over the course of Amador's opening statement, the district court sustained several objections made by the State and admonished Amador to confine himself to what he believed the evidence would tend to show and to avoid making arguments. The general thrust of Amador's opening statement was an appeal to the jurors to closely scrutinize the State's evidence against Rudin. After Amador completed his opening statement, the case proceeded. The State began presenting its case-in-chief.

On March 5, 2001, Rudin notified the district court, outside the jury's presence, that she was dissatisfied with her defense counsel. During an in-chambers meeting with the judge and without the presence of either her attorneys or the prosecutors, Rudin stated that she believed that Amador was not prepared to try the case, had not adequately investigated witnesses and had problems in his personal life that were impairing his effectiveness. Nonetheless, Rudin

indicated that she did not desire a mistrial because she was satisfied with Pitaro's legal representation and she did not want to replace Amador. Instead, she wanted Pitaro to take a more active role on the case.

Immediately following this discussion, the district court called Pitaro, Amador and the prosecutors into chambers to further discuss the matter. Amador indicated that he was having difficulty preparing the case because two of his employees, his wife and his mother-in-law, had terminated their employment one month before trial. After further questioning by the district court, Pitaro agreed to assume a more active role in the case. Concerned that jeopardy would attach, the State refused to request a mistrial even though it expressed the need for a clean record. At this time, the district court, Rudin, Amador and Pitaro were put on notice that the State was pursuing an investigation into Rudin's indigent status and Amador's alleged acceptance of money from media enterprises. Amador denied the allegations. At the conclusion of the meeting, the district court indicated that it was willing to give the defense extra time during the trial to prepare its case. Rudin indicated that she was satisfied that all of her concerns had been addressed. The State continued to present its case-in-chief.

On March 8, 2001, the district court conducted a hearing to determine if Rudin and her counsel needed additional time to prepare. The district court was informed that the defense was prepared and did not, as yet, need any additional time.

However, on March 15, 2001, during another in-chambers conference and after direct examination and some cross-examination of Cantrell, Rudin, through counsel, moved for a mistrial. Again, Rudin claimed that Amador was not adequately prepared, that he had failed to adequately cross-examine Cantrell and that Pitaro had joined the case too late to remedy the problem. In denying Rudin's motion for a mistrial, the district court accepted Amador's arguments that he had used his best efforts. The district court stated that while Amador's opening statement was ineffective, it was not evidence, and that Rudin had the benefit of being represented by both Pitaro and Amador. The district court also noted that Amador had just begun to cross-examine Cantrell when the court recessed over an evidentiary objection and that there was no indication Amador was not prepared to cross-examine Cantrell or that Amador would not be prepared to cross-examine future witnesses adequately. The district court indicated it would not grant a mistrial based solely on Rudin's speculations and reiterated that it would authorize additional investigative fees or continuances if counsel needed additional time. The district court denied Rudin's motion for a mistrial, concluding that there was not enough evi-

dence of prejudice to support a finding that a mistrial was manifestly necessary. Nonetheless, on March 29, 2001, the district court appointed John Momot as an additional attorney for Rudin.

Once again, the State continued to present its case-in-chief. Although the State called over sixty witnesses, its case against Rudin rested primarily upon: (1) Cantrell's testimony concerning Rudin's admissions and conduct before and after Ron's disappearance, (2) Lovato's testimony concerning what he observed while working in Rudin's home, (3) ballistic evidence indicating that Ron had been shot with his own .22 caliber Ruger handgun, and (4) forensic evidence suggesting that Ron had been shot inside the master bedroom.

The defense began its case-in-chief on April 16, 2001, after being granted a five-day recess subsequent to the State's completion of its case-in-chief. The defense rested after four days of testimony. The defense elicited testimony from over twenty witnesses; however, the focal points of its case were: (1) an expert's testimony that forensic evidence did not support the conclusion that Ron was murdered in the master bedroom, and (2) that several other people had a motive and opportunity to kill Ron.

On April 23, 2001, after the defense had rested its case, Donald Shaupeter contacted the defense. Shaupeter allegedly consigned a steamer trunk to Honabach, which Honabach then sold to Rudin. Contrary to Honabach's testimony, Shaupeter claimed that he consigned a small case to Honabach, but not a steamer trunk. Since Shaupeter claimed that he had previously supplied the State's investigator with this information, Rudin filed a motion to dismiss the charges on the theory that the State had withheld exculpatory evidence from Rudin. According to the State's investigator, Shaupeter did not deny that he consigned a trunk to Honabach; rather, the investigator recalled that Shaupeter had very little recollection of any of the individual items that had been consigned to Honabach.

The district court concluded that the State had improperly withheld Shaupeter's statements from the defense and that it was not for the State to decide whether Shaupeter's testimony was exculpatory or inculpatory. Nonetheless, the district court concluded that the error was not of sufficient magnitude to justify a mistrial. As a remedy, the district court allowed the defense to reopen its case-in-chief to elicit testimony from Shaupeter. The district court also permitted Rudin's counsel to tell the jury that the State had improperly withheld Shaupeter's statements.

On April 25, 2001, the parties delivered their closing arguments. During a recess, the district court asked Juror Number Eleven to remain behind so that it could address, outside the pres-

ence of the jury as a whole, a concern over a reported argument between Juror Eleven and a staff person at the Golden Nugget over a smoking break. Juror Eleven stated that she wanted to remain on the jury and that she did not believe there would be a problem with smoking breaks in the future. Both the defense and the State were present during this colloquy; neither wished to make any comments for the record. Subsequently, the parties concluded their closing arguments. The jury commenced deliberations.

On Monday, April 30, 2001, the district court met with the defense and the State in chambers to address another issue that had arisen over the weekend concerning Juror Eleven. The district judge informed the parties that he had been contacted by Alternate Juror Number Three, who stated that Juror Eleven had contacted her. According to Alternate Three, Juror Eleven had called Alternate Three and had told her that she was upset because she was the only person in favor of a not guilty verdict and because she had gotten into an altercation with the staff person at the Golden Nugget. The defense moved for a mistrial, arguing that the improper communication between the juror and the alternate had tainted the jury. After questioning Alternate Three and Juror Eleven in the presence of the State and the defense, the district court denied Rudin's motion for a mistrial. The district court also decided not to discharge Juror Eleven, concluding that the jury had not been tainted and that Rudin had not been prejudiced by the communication.

On May 1, 2001, the district court and the parties met in chambers again to discuss a third issue that had arisen regarding Juror Eleven. The State indicated that it had obtained information which suggested that Juror Eleven had been untruthful during jury selection about whether she had any close friends in law enforcement and about whether she had ever been the victim of a crime. Accordingly, the State moved that she be discharged from the jury. After meeting with Juror Eleven in chambers and without the parties being present, the district court chose not to remove Juror Eleven.

On May 2, 2001, after thirty-eight days of trial, the jury returned a verdict against Rudin of guilty on Counts I and II. Following the verdict, the jury foreman held a one-person press conference during which he declared:

> In his opening remarks on March 2, [defense attorney] Michael Amador said, "This is a great day." I submit to you that today, May 2, is a great day. Ronald Rudin, his family and the people of the great state of Nevada can [take] comfort in the fact that justice was served today.

On May 8, 2001, Rudin filed a motion for a new trial based on several asserted errors. During a hearing the next day, Rudin,

through Pitaro and Momot, moved to terminate Amador's services as her defense attorney, alleging that Amador had engaged in misconduct, including: (1) abusing drugs, (2) retaining her personal possessions without her permission, (3) mishandling her defense, (4) secretly securing media rights to her case while representing to the district court that he was working on a pro bono basis, and (5) secretly releasing private information to tabloid media publications against her wishes. After the hearing, the district court granted Rudin's motion to relieve Amador from further representing Rudin in her case. After a subsequent hearing on August 24, 2001, the district court denied Rudin's motion for a new trial, finding that Rudin had failed to present any specific evidence or argument to support a determination that she had been prejudiced.

A judgment of conviction was entered against Rudin on September 17, 2001, on Count I, unauthorized surreptitious intrusion of privacy by listening device, and Count II, murder with use of a deadly weapon. She was sentenced to one year in prison for Count I, and life in prison with the possibility of parole after ten years for Count II, plus an equal and consecutive sentence for the deadly weapon enhancement. The court ordered the sentences for Count II to run concurrently with Count I. Rudin timely filed her notice of this appeal.

## DISCUSSION

### Expert testimony

Rudin contends that the district court abused its discretion by admitting the testimony of the State's blood splatter expert, Michael Perkins. Rudin argues that Perkins was not qualified to be an expert witness and that his testimony was unreliable. This court has held that a district court has discretion to qualify a particular witness as an expert and to permit that witness to give opinion evidence.[3] Here, the record reflects that Perkins had extensive training and experience with regard to blood splatter interpretation, and accordingly, the district court did not abuse its discretion in allowing Perkins to testify as an expert on this subject.[4]

Expert testimony is only admissible if the individual's "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."[5] Examining the nature of

---

[3]*Dow Chemical Co. v. Mahlum,* 114 Nev. 1468, 1482, 970 P.2d 98, 108 (1998), *disagreed with on other grounds by GES, Inc. v. Corbitt,* 117 Nev. 265, 271, 21 P.3d 11, 15 (2001); NRS 50.275.

[4]*See* NRS 50.275.

[5]*Id.*

blood splatter evidence at a crime scene often requires expert testimony.[6] Certainly, opinions concerning trajectory based upon the appearance and placement of blood splatters is beyond the experience of lay jurors. As such, the opinions of an expert would be helpful to the jurors.[7] Perkins's testimony concerned the probable trajectories of the blood droplets found in Rudin's former master bedroom.

Rudin also attacks Perkins's use of a demo version of a blood splatter software program. NRS 50.285(2) provides that an expert may base an opinion on facts or data that are ''of a type reasonably relied upon by experts in forming opinions or inferences upon the subject.'' Perkins testified that the program is widely used by blood splatter experts. We therefore perceive no error on the part of the district court in allowing the testimony. Moreover, Rudin's counsel, Thomas Pitaro, cross-examined Perkins extensively on the use of a demo program rather than the original program and on the failure of Perkins's laboratory to test the program. The jury therefore was presented with reasons to either accept or reject Perkins's opinions which were formed by reference to the demo version of the blood splatter software program.

Rudin contends that it was unreasonable for Perkins to consult with other experts or retrieve information from the Internet. Rudin offers no basis for this claim. While Perkins may have consulted literature available through the Internet and with other experts, Perkins also relied on his observations from other crime scenes, and conducted experiments as to several causes of the blood splatter pattern before reaching a conclusion. All such consultations on Perkins's part are permitted pursuant to NRS 50.285(1). Accordingly, Rudin's argument is without merit. We conclude that the district court acted within its discretion when it admitted Perkins's expert opinions.

*Prosecutorial misconduct*

Second, Rudin contends that she was deprived of her right to a fair trial as a result of prosecutorial misconduct. In determining whether prosecutorial misconduct has deprived a defendant of a fair trial, we inquire as to ''whether the prosecutor's statements so infected the proceedings with unfairness as to make the results a denial of due process.''[8] Furthermore, a defendant is entitled to a fair trial, not a perfect one and, accordingly, '' '[a] criminal con-

---

[6]*See People v. Clark,* 857 P.2d 1099, 1142 (Cal. 1993).

[7]NRS 50.285(1).

[8]*Greene v. State,* 113 Nev. 157, 169, 931 P.2d 54, 62 (1997), *overruled in part on other grounds by Byford v. State,* 116 Nev. 215, 235, 994 P.2d 700, 713 (2000).

viction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context.' ''[9] Finally, we will determine whether any prosecutorial misconduct that did occur was harmless beyond a reasonable doubt.[10]

Rudin argues that the State engaged in misconduct by: (1) granting immunity to Yehuda Sharon; (2) making improper comments before and during her trial; (3) sharing information with the trustees of Ron's estate; and (4) withholding, prior to trial, the statements that Donald Shaupeter made to the police.

First, while Rudin charges that the State improperly coerced Sharon's testimony, there is no evidence of coercion in the record. Rudin also contends that the State engaged in misconduct when it granted Sharon immunity. "The granting of immunity is traditionally a function of the prosecution . . . ."[11] Upon the State's motion, NRS 178.572 empowers the district court with discretion to grant a witness immunity.[12] Although in some circumstances, a prosecutor's failure to grant use immunity to a defendant's witness may constitute prosecutorial misconduct,[13] Rudin has failed to explain how the State's grant of immunity to Sharon unfairly prejudiced her defense. More to the point, we find no prejudice to Rudin flowing from the State's grant of immunity to Sharon given that he denied any personal wrongdoing and he also refused to implicate Rudin in Ron's death.

Finally, Rudin argues that the State took inconsistent positions when, during the grand jury proceedings, Assistant District Attorney Charles Thompson stated that the State knew that Sharon did not kill Ron but then, at trial, proceeded to prosecute Rudin on a theory that Sharon aided and abetted Rudin in killing Ron. The district attorney's statement during grand jury proceedings and the

[9]*Id.* (quoting *United States v. Young,* 470 U.S. 1, 11 (1985)).

[10]*Witherow v. State,* 104 Nev. 721, 724, 765 P.2d 1153, 1155 (1988).

[11]*McCabe v. State,* 98 Nev. 604, 606, 655 P.2d 536, 537 (1982).

[12]*Id.* NRS 178.572(1) provides that "the court on motion of the State may order that any material witness be released from all liability to be prosecuted or punished on account of any testimony or other evidence he may be required to produce."

[13]*Williams v. Woodford,* 306 F.3d 665, 698 (9th Cir. 2002) (stating that, to demonstrate prosecutorial misconduct, the defendant "must show that the prosecution intentionally caused a defense witness to invoke the Fifth Amendment right against self-incrimination, or that the prosecution granted immunity to a government witness in order to obtain that witness's testimony, but denied immunity to a defense witness whose testimony would have directly contradicted that of the government witness").

State's theory at trial that Sharon aided and abetted Rudin in killing Ron are not entirely inconsistent. The State informed the jury that Sharon had been granted immunity and that the State believed that Sharon was Rudin's accomplice. Rudin also argues that, during trial, the district court erred when it characterized the district attorney's prior statement concerning Sharon as hearsay and, therefore, inadmissible. The statement of an attorney is not evidence,[14] nor is it admissible against the government as a party admission.[15] Rudin provides no support for her contention that the district court should have admitted the attorney's statement as evidence. Accordingly, Rudin's argument on this matter is without merit.

Second, as to the State's allegedly improper comments, we conclude that the comments did not impair Rudin's right to a fair trial. Rudin challenges the State's quotation of a passage from her diary during the State's opening statement. The passage was written shortly after Rudin married Ron and read as follows:

> My life has always been unique, exciting, full of change, challenges and stimulus and full of interesting casts of characters and that is okay.
>
> It just is, and I accept that for my past, but I know that, by programming my mind, I can now redirect any future stage plays and pick my own screen play and cast, because I am the producer, director and star of any and all new plays on my stage called life.
>
> I've always vaguely known these facts and lived my life accordingly, but I never realized what control—I never realized what control I could have over every segment of this one time stage production called ''Margaret's Life.''

This passage was consistent with the State's theory that Rudin was controlling and manipulative. There is nothing in the quotation that is patently, unfairly prejudicial by itself. Similarly, Rudin's assertion that the State engaged in misconduct when it referenced the perjury statute while questioning Rudin's nephew during the investigative grand jury proceedings is also without merit. The State is not prohibited from reminding a witness of the consequences of perjury during a witness's testimony, especially when a witness denies making certain admissions attributed to him by the police.

---

[14]*County of Alameda v. Moore,* 40 Cal. Rptr. 2d 18, 20 (Ct. App. 1995).

[15]*United States v. Kampiles,* 609 F.2d 1233, 1246 (7th Cir. 1979) (holding that statements by government employees are not admissible against the government because they are viewed as being outside the admissions exception to the hearsay rule).

Such was the case here. Furthermore, because the State's com-ments were made during the grand jury proceedings and not before the jury at Rudin's trial, the comments did not undermine Rudin's right to a fair trial.

Third, Rudin contends that the State committed prosecutorial misconduct when it released the investigative files of Ron's murder to the trustees of Ron's estate. Rudin provides no support for her contention. NRS 179A.120(1) permits the release of information to a crime victim's relatives where that information may assist the victim in obtaining redress in a civil action for the victim's injury or loss. In the instant case, at the request of Ron's cousin, Brenda Woods, the State revealed to Ron's trustees only the names, ad-dresses and investigative files obtained through police investiga-tion. Because the State released only limited information to Ron's relatives that was obtained through police investigation of Ron's disappearance and not through evidence presented at the grand jury proceedings, the State did not engage in misconduct and Rudin's right to a fair trial was not jeopardized. Moreover, while Rudin im-plies the existence of a conspiracy between the State and the trustees of Ron's estate, she makes no specific factual allegations or arguments in support of this naked claim. Accordingly, Rudin's arguments on this matter are without merit.[16]

Finally, while the State acted improperly in failing to disclose to Rudin's counsel the statements of Donald Shaupeter,[17] we note that this matter was appropriately addressed by the district court and that Rudin was permitted to remedy the State's improper act by re-opening her case and presenting Shaupeter's testimony to the jury. Moreover, the district court permitted Rudin to let the jury know that the State had failed to provide this evidence to the defense. Since Shaupeter's testimony and the State's misconduct were pre-sented to the jury, we conclude that any error that occurred as a re-sult of the State's *Brady* violation was harmless.[18]

---

[16]*See Hargrove v. State,* 100 Nev. 498, 502, 686 P.2d 222, 225 (1984) (holding that mere " 'naked' allegations'' will not support a claim for relief).

[17]*See Brady v. Maryland,* 373 U.S. 83, 87 (1963) (holding that the State must disclose evidence favorable to the defense if the evidence is material ei-ther to guilt or to punishment); *Lay v. State,* 116 Nev. 1185, 1194, 14 P.3d 1256, 1262 (2000) (holding that a prosecutor is obligated to disclose evidence that is favorable to the defense as long as the evidence is material to guilt or punishment).

[18]*See Jones v. State,* 113 Nev. 454, 471, 937 P.2d 55, 65-66 (1997) (hold-ing that if a *Brady* violation had occurred, the alleged error was harmless be-cause the substance of the withheld statements reached the jury).

140

*Judicial misconduct*

Next, Rudin contends that she was deprived of her right to a fair trial as a result of the district court's alleged judicial misconduct. In *Oade v. State,* we noted that the words and actions of the trial judge are likely to shape the opinion of the jury members to the extent that one party may be prejudiced.[19] While the district court must protect the defendant's right to a fair trial, "[a] trial judge is charged with providing order and decorum in trial proceedings,"[20] and must also concern itself with the flow of trial and protecting witnesses.[21]

Rudin asserts that her right to a fair trial was undermined by repeated instances of judicial misconduct, including: (1) judicial comments made before and during her trial that belittled her attorney, Michael Amador; (2) ex parte conversations; and (3) improper conduct in connection with the hearing on her motion for a new trial. First, we conclude that the majority of the district court's admonishments of Amador did not amount to misconduct because they were made in the appropriate interests of controlling the flow of the proceedings, saving time and avoiding confusion.[22] Moreover, the record reflects that Amador repeatedly attempted, inappropriately so, to argue the facts of the case both during jury selection and his opening statement. Consequently, the district court was placed by Amador in the position of balancing the need to admonish Amador with the need to protect

[19]114 Nev. 619, 623, 960 P.2d 336, 339 (1998) (concluding that, viewed in the entirety, the district court remarks to defense counsel may have had a prejudicial impact on the verdict); *cf. Randolph v. State,* 117 Nev. 970, 985, 36 P.3d 424, 434 (2001) (concluding that, where the "district court's expressions . of annoyance with defense counsel in front of the jury numbered only two and were not extreme," the defendant was not prejudiced).

[20]*Parodi v. Washoe Medical Ctr.,* 111 Nev. 365, 367, 892 P.2d·588, 589 (1995).

[21]*See Robins v. State,* 106 Nev. 611, 624, 798 P.2d 558, 566-67 (1990) (concluding that the "trial judge was appropriately controlling the flow of the trial without prejudice to" the defendant when it admonished counsel); NRS 50.115(1)(c) (providing that a judge must "exercise reasonable control over the mode and order of interrogating witnesses . . . [t]o protect witnesses from undue harassment or embarrassment").

[22]*See Leonard v. State,* 114 Nev. 1196, 1211, 969 P.2d 288, 298 (1998) (holding that a defendant was not deprived of his right to a fair trial when the district court admonished defense counsel to quit wasting time by individually greeting each juror during jury selection); *Robins,* 106 at 624, 798 P.2d at 566-67 (holding that a district court's admonishment directing defense counsel to quit confusing a juror and move on was appropriate in the interest of "controlling the flow of the trial").

Rudin's right to a fair trial. Despite this difficulty, none of the district court's comments reflect any animus towards Amador; rather, the comments reveal the district court's concern for the orderly process of the trial. The district court, time and again, admonished Amador to refrain from unnecessary deviations from the path of the proceedings and encouraged Amador to return to and remain on point. As to the remaining remarks, while the district court made inappropriate references to past trial experiences that may have suggested the district court's opinion concerning the case, the district court also gave a standard instruction cautioning the jury not to take any comments by the court as an expression of opinion. Given the instruction, the infrequent nature of these comments and the evidence, we conclude that any improper remarks by the district court did not prejudice Rudin's right to a fair trial.

Second, we conclude that the district court's alleged improper ex parte conversations were not improper. While the district court did have ex parte conversations with Rudin and with a juror, Canon 3 of Nevada's Code of Judicial Conduct specifically permits ex parte contacts when a "judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication," and the judge promptly notifies the "parties of the substance of the ex parte communication and allows an opportunity to respond."[23] Here, the district court's meeting with Rudin was initiated by the defense, placed on the record and followed by lengthy discussions with counsel for both parties. Nothing in the record suggests that either side was likely to gain an advantage as a result of Rudin's meeting with the district court. Similarly, the district court recorded its discussion with Juror Eleven and immediately disclosed the substance of the conversation to counsel for both parties, who offered no objections and no further comment on the matter. Moreover, there is no indication that Rudin was prejudiced by the district court's conversation with the juror because the district court decided not to discharge the juror who, we observe, apparently was the only juror favoring a not guilty verdict at that time.

Third, the district court did not act improperly in connection with Rudin's motion for a new trial. Rudin argues that the district court abused its discretion by limiting argument on her motion for a new trial, but a district court exercises discretion when consid-

---

[23]NCJC Canon 3B(7)(a)(i) & (ii).

ering a motion for new trial.[24] Here, the district court properly exercised its discretion by considering the parties' briefs and requesting additional oral argument on the issues that the district court believed had arguable merit. Contrary to Rudin's assertions, no facts exist in the record to suggest that the district court's decision was colored by bias or a lack of impartiality. Since it is Rudin's burden to set forth such facts,[25] her naked allegations are without merit.[26] Similarly, apart from Rudin's naked allegation that the district court was attempting to undermine her defense, nothing is pointed to in the record to suggest that the district court acted improperly when it persuaded her former trial attorney to represent her at her sentencing on a pro bono basis. Accordingly, Rudin's bare allegations on this matter are also without merit.

### March 15th motion for mistrial

Rudin contends that the district court erred in applying the manifest necessity standard to her March 15, 2001, motion for mistrial based on Amador's alleged lack of preparation. We agree, but we conclude that the district court nonetheless reached the correct result in denying Rudin's motion.

The trial court has discretion to determine whether a mistrial is warranted, and its judgment will not be overturned absent an abuse of discretion.[27] Where the State moves for a mistrial or the court declares a mistrial on its own motion, double jeopardy bars retrial unless the "declaration of the mistrial was dictated by manifest necessity or the ends of justice."[28] Even in the presence of manifest necessity, where a "prosecutor is responsible for the circumstances which necessitated declaration of a mistrial," double jeopardy will prevent retrial of the defendant.[29] A defendant's request for a mis-

---

[24]*See Steese v. State,* 114 Nev. 479, 490, 960 P.2d 321, 328 (1998).

[25]*See Hogan v. Warden,* 112 Nev. 553, 560, 916 P.2d 805, 809 (1996) (noting that judges are presumed to be unbiased and that a party seeking to establish bias "has the burden of setting forth sufficient facts that demonstrate bias or the appearance thereof").

[26]*See Hargrove,* 100 Nev. at 502, 686 P.2d at 225 (holding that mere " 'naked' allegations" will not support a claim for relief).

[27]*Meegan v. State,* 114 Nev. 1150, 1155, 968 P.2d 292, 295 (1998), *modified on other grounds by Vanisi v. State,* 117 Nev. 330, 341, 22 P.3d 1164, 1172 (2001).

[28]*Hylton v. District Court,* 103 Nev. 418, 422, 743 P.2d 622, 625 (1987).

[29]*Id.* at 423, 426, 743 P.2d at 625, 627 (concluding that the prosecutor "did not prevent the circumstances for a mistrial from occurring, when the prosecutor had adequate notice that a mistrial was likely to occur and when the

trial, however, constitutes a clear and deliberate election to forgo one's valued right to a trial by the first jury.[30] Thus, the manifest necessity standard generally does not apply to a defense motion for a mistrial.[31] We therefore conclude that the district court erred to the extent that it used the manifest necessity standard to review Rudin's motion.

While the district court erroneously invoked the manifest necessity standard, we conclude the district court did not err in denying the motion.

Rudin claimed Amador was inadequately prepared to handle his portion of the defense and that Amador had not properly investigated the case. Rudin expressed no dissatisfaction with attorney Pitaro but was concerned that neither Pitaro nor Amador would be able to properly represent her as preparation for future witnesses and investigations were ongoing while the trial continued. Solely for the purposes of addressing the motion for a mistrial, the district court made a preliminary inquiry on Amador's preparedness using as a general standard the test for ineffective assistance of counsel under the *Strickland v. Washington* "reasonably effective assistance" test.[32] The district court concluded that, based on the *Strickland* standard, Rudin had not been prejudiced by Amador's alleged lack of preparation.[33]

---

prosecutor's office was expressly asked by the court to be forthcoming on that issue," therefore committing "inexcusable" negligence and precluding further prosecution of the defendant on double jeopardy grounds).

[30]*United States v. Scott,* 437 U.S. 82, 93 (1978); *see also Melchor-Gloria v. State,* 99 Nev. 174, 178, 660 P.2d 109, 112 (1983) (noting that, when the defense seeks a motion for a mistrial, an exception to the general rule that the mistrial removes any double jeopardy bars to reprosecution arises where "the prosecutor intended to provoke a mistrial or otherwise engaged in 'overreaching' or 'harassment'").

[31]*See Wheeler v. District Court,* 82 Nev. 225, 229, 415 P.2d 63, 65 (1966) (requiring a finding of manifest necessity before a mistrial may be declared, unless the defendant consents to the mistrial); *see also Benson v. State,* 111 Nev. 692, 695-96, 895 P.2d 1323, 1326 (1995) (stating that, "[t]he issue of consent by a defendant arises most often when the trial court sua sponte declares a mistrial or, more rarely, . . . where the prosecution moves for one," and that, generally, " 'a defendant's motion for, or consent to, a mistrial removes any double jeopardy bar to reprosecution'" (quoting *Melchor-Gloria,* 99 Nev. at 178, 660 P.2d at 111)).

[32]466 U.S. 668, 687-88 (1984) (requiring that the defendant demonstrate that her counsel's representation fell below an objective standard of reasonableness and that counsel's performance prejudiced the defense); *see Warden v. Lyons,* 100 Nev. 430, 432, 683 P.2d 504, 505 (1984) (adopting the "reasonably effective assistance" test set forth in *Strickland*).

[33]We recognize that *Strickland* identifies a post-conviction standard for reasonably effective assistance of counsel. We do not intend for our remarks here to foreclose any potential post-conviction inquiries.

A defendant's request for a mistrial may be granted for any number of reasons where some prejudice occurs that prevents the defendant from receiving a fair trial.[34] In the case of allegations of ineffective assistance of counsel, counsel's ineffective performance must be " ' 'so prejudicial as to be unsusceptible to neutralizing by an admonition to the jury.' ' "[35] Therefore, Rudin must demonstrate that Amador's actions prejudiced her defense and that the district court failed to neutralize Amador's performance to ensure a fair trial.

The record does reflect that Amador had difficulty preparing for Rudin's trial and that the district court responded to this problem by alternatively admonishing counsel and accommodating the defense in order to promote fairness in the proceedings. The district court responded to both Amador's failings and the State's failings in a remedial fashion, granting all requests short of declaring a mistrial. For instances, the district court granted the defense extra time during the trial to prepare its case, Pitaro was given the leading role in trying the case, John Momot was appointed as Rudin's third defense attorney, and the defense was permitted to tell the jury about the State's *Brady* violation.

Similarly, while Rudin alleges that Amador should have retained all experts prior to trial, the record reflects Rudin was not prejudiced as a result of Amador's failure because the defense presented several expert witnesses during its case-in-chief. A defendant is not entitled to a perfect trial, only a fair trial.[36] We conclude the district court did not err in finding that Rudin's right to a fair trial was not prejudiced and denying Rudin's motion for a mistrial.

*Motion for new trial*

Rudin sought a new trial primarily on grounds relating to Amador's alleged misconduct or lack of preparation.[37] Rudin con-

---

[34]*See Randolph,* 117 Nev. at 985, 36 P.3d at 434 (concluding that "the district court's expressions of annoyance with defense counsel in front of the jury" did not prejudice the defense and were not grounds for a mistrial); *Lisle v. State,* 113 Nev. 679, 699-700, 941 P.2d 459, 473 (1997) (concluding that any prejudice to defendant as a result of the prosecutor eliciting improper testimony was cured by the trial court when it chastised the prosecutor and ordered him to cure the improper testimony, and therefore, a mistrial is not warranted), *limited on other grounds by Middleton v. State,* 114 Nev. 1089, 1117 n.9, 968 P.2d 296, 315 n.9 (1998).

[35]*Geiger v. State,* 112 Nev. 938, 942, 920 P.2d 993, 995 (1996) (quoting *Allen v. State,* 99 Nev. 485, 490, 665 P.2d 238, 241 (1983)).

[36]*Manley v. State,* 115 Nev. 114, 129, 979 P.2d 703, 712 (1999).

[37]Rudin also asserted jury misconduct and judicial misconduct as grounds for a new trial. We have considered these arguments and find them to be without merit.

tended that Amador improperly attempted to secure media rights to Rudin's story and his actions deprived her of a fair trial. After conclusion of the trial, the State discovered, initially through Amador's secretary, Annie Jackson, that Amador, during the course of representing Rudin, had negotiated contracts with media enterprises concerning his involvement in the case and his representation of Rudin. At an in-chambers hearing after Amador had been removed as co-counsel, Jackson testified that she discovered three contracts pertaining to literary and media rights, one with a production company for movie rights signed by Amador's partners and Rudin, a book deal signed by Rudin, and a media release giving Amador control over Rudin's media rights. Jackson also testified that Amador had been writing a book during the course of trial, that he had leaked information on Rudin and had given pictures of Rudin's family to the *National Enquirer,* and that Amador was affiliated with a website that had covered Rudin's trial.

SCR 158(4) provides that during the course of representation, a lawyer may not negotiate agreements pertaining to literary or media rights based on representation of a client. A presumption of prejudice arises when an actual conflict of interest adversely affects counsel's performance.[38] The district court did not make a specific finding regarding the truth of Jackson's allegations. Had the district court accepted the allegations as true, and if Amador's conduct created a conflict with his client, the record is insufficient to demonstrate that Amador's alleged conflict adversely affected his performance.

Based on the evidence presented by the defense and the cross-examination of witnesses, the performance of attorneys Pitaro and Momot and the strength of the State's case, the district court concluded that Amador's conduct did not prejudice Rudin's right to a fair trial. We agree. Amador's mistakes were adequately addressed and remedied by the district court, which also appointed additional attorneys to represent Rudin. While we do not approve of Amador's alleged acts concerning Rudin's literary and media rights, the record is insufficient to permit the conclusion that Amador's performance during trial was adversely affected by this alleged conflict of interest or that his performance prejudiced Rudin's right to a fair trial. Accordingly, we conclude that Rudin's argument is without merit and the district court did not err in denying the motion for a new trial.

We note that the dissent concludes, based upon Amador's apparent conflict of interest, that we are obligated to reverse and order a new trial. While we certainly share our colleagues' concern for Amador's unprofessionalism, we reiterate our observation that

---

[38]*Clark v. State,* 108 Nev. 324, 326, 831 P.2d 1374, 1376 (1992).

Rudin's claim concerning Amador's conflicts remains just that—a claim. The existing rule, and the better rule, requires that this issue, along with the general issue concerning Amador's ineffectiveness must be examined in a separate post-conviction proceeding at which time Rudin's post-conviction attorney will examine the entire record, interview all relevant witnesses and present the matter to the district court for a full and complete airing and decision.

## CONCLUSION

Based on the above, we conclude that Rudin's arguments are without merit and that she was not prejudiced in her right to a fair trial. Accordingly, we affirm the judgment of conviction.

SHEARING, C. J., BECKER and GIBBONS, JJ., concur.

ROSE, J., with whom MAUPIN, J., agrees, dissenting:

I agree with the majority opinion, except I believe that a mistrial should have been granted when it was obvious that the defense was not prepared to try the case. I also believe that defense attorney Amador had a clear conflict of interest with his client and this too requires reversal and a new trial.

### Amador's lack of preparation and motion for mistrial

Concerns had been voiced about Amador's preparation to try this major case prior to trial, but no one had anticipated what they would hear and see at the beginning of the trial. Amador's voir dire was rambling, and he attempted to argue the facts of his case. The district court judge repeatedly admonished him to stop trying to argue his case during voir dire and warned Amador that he was going ''to keep a close eye'' on him. This was followed by an equally prejudicial opening statement by Amador.

Amador began his opening statement by declaring: ''This is a great day. . . . [E]very day . . . can be a celebration. . . . This is a great day for me. This is a culmination of a career.'' He then declared that he had thrown away most of his prepared remarks and launched into a disjointed argument that was interrupted numerous times by objections from the State, which the district court sustained. Finally, after yet another sustained objection, the district court judge stated to Amador:

> Again, I keep saying this—and I let you get away with a lot, Mr. Amador—but the purpose for an opening statement is just to indicate what the evidence is going to tend to show and not go into your personal beliefs and your passion and soccer dad and yelling at the staff and whether you were a green lawyer and know all the cops and used to be a D.A. and you commu-

nicate differently. I never heard that in [an] opening statement in my life.

Amador also stated in his opening statement: "During the course of the trial, there may be objections and things like that. Don't worry about it." The district court judge interrupted: "I don't know what that means: Don't worry about objections. We have to do other things. I have no idea what that means. If there's an objection, I'm either going to overrule it or sustain it and that's the law."

The opening statement of a criminal case is extremely important in asserting a successful defense.[1] In fact, studies have repeatedly shown that the impression a juror has after opening statements usually carries with him or her to become the verdict in the case.[2] For that reason, by the end of opening statements, Rudin was already at a great disadvantage even though no evidence had been presented.

Following opening statements, the State called as its first witnesses the two fishermen who found Ron Rudin's remains at Lake Mohave, and then Rudin asked to see the district court judge personally about her defense. The extraordinary in-chambers meeting occurred on Monday morning, March 5, 2001, and was attended by the district court judge, his law clerk, the court reporter, and Rudin. Rudin stated that several friends were appalled with Amador's opening statement, and she felt that because of personal

[1]*See* Harvey J. Lewis, *One Trial Lawyer's Perspective,* 48 La. B.J. 93, 93 (2000) (noting the importance of opening statements because studies have shown that, in four out of five cases, jurors at least tentatively decided a case after hearing opening statements, and the jurors did not change their minds after hearing the evidence); Thomas A. Mauet, *The New World of Experts in Federal and State Courts,* 25 Am. J. Trial Advoc. 223, 224 (2001) (noting that jury research shows that opening statements are very important because at this early stage of a trial jurors are much more influenced by what lawyers tell them); Barry McNeil & Portia A. Robert, *War Story: An Interview with Judge Barefoot Sanders,* 28 Litig. 43, 48 (2002) (observing that the opportunity to give the jury the right impression of a case comes with the opening statement); Matthew J. O'Connor & Nicholas B. Schopp, *Opening Statement Restriction Lifted? Are the Scales of Justice Tipping Back to Even After* State v. Thompson*?,* 58 J. Mo. B. 35, 36 (2002) ("The profound impact of opening statements in a criminal trial is without dispute."); Shari Seidman Diamond, *Scientific Jury Selection: What Social Scientists Know and Do Not Know,* 73 Judicature 178, 182-83 (1989/1990) (noting that "[t]he structure provided in opening statements helps the jury organize the evidence and guides the jury's thinking during the trial").

[2]*See* Harry Kalven, Jr. & Hans Zeisel, *The American Jury,* 23 Am. J. Trial Advoc. 203, 203 (1999) (observing that studies have shown that 80 percent of jurors make up their minds after opening statements); *see also* James W. Quinn, *The Mega-Case Marathon,* 26 Litig. 16, 20 (2000) ("Most experts agree that the jurors' first impressions from opening statement can be powerful influences at the end of the case.").

problems, Amador was not prepared to try her case. The district court judge indicated that he would not comment on Amador's opening statement but did admit that he did not interrupt Amador as often as he probably should have because he was concerned about it reflecting adversely on her. Sadly, it already had. She indicated that she did not want a mistrial, but wished that Pitaro would take a more active role in the case. Pitaro had been appointed shortly before trial to assist Amador with expert witness testimony so that a continuance would not be necessary. The district court judge indicated that he recently gave her attorneys permission to retain experts, and Rudin asked about her lay witnesses for trial. Rudin commented, ''We haven't even subpoenaed my witnesses yet. And I'm getting so nervous. I mean, I'm getting panicky.'' The district court judge indicated that reasonable funds would be provided to subpoena her witnesses, and her attorneys then joined the conference.

Amador confirmed that he had substantial personal problems culminating when his wife and mother-in-law, who were his secretary and legal assistant, walked out of his office one month prior to trial and never came back. The district court judge then admonished Amador that the case was not about him, although that was all he had heard about in the pretrial motions and the opening statement. He also indicated that he had not been in favor of Amador doing this case pro bono, and that the case must be about giving Rudin a fair trial. Pitaro indicated that he was willing to assume a greater role in the trial, but warned the district court judge that he and the investigators had not had a chance to review voluminous files and financial records.

The prosecutors then joined the conference and were informed that Rudin wanted Pitaro to assume a more active role in the case. The district court judge commented that he was inclined to permit this to avoid a mistrial. The State was rightfully concerned that it had not been a party to the important discussion that had just occurred, and then asked if Pitaro could be ready to take an expanded role in the trial if the trial was continued a few days. Pitaro indicated that he would do the best he could since the district court judge had indicated the trial was going forward, but he did not know if he could be prepared to conduct a majority of the rest of the trial. He unequivocally stated that he was not prepared to try the case at that time.

The State was clearly worried about the lack of preparation by the defense team. ''Already we have an appellate issue now, should they have hired a forensic accountant. And I mean they came into this thing hiring their experts two weeks before the trial and they didn't start looking at the evidence until the day of trial. Two days into it, we still don't have reports back for most of them.'' And a

little later, one prosecutor stated: "Mr. Pitaro is coming in now, he's going to try to read the stuff and catch up. He already feels there's certain things that should have happened that didn't happen. . . . All I can say is we're really uncomfortable with the record here." The district court judge opined that there was an insufficient showing of manifest necessity to justify a mistrial.

The trial proceeded and the State called Dona Cantrell, Rudin's sister. Cantrell was extremely important to the State's case because she had been a confidant of Rudin's and in close physical proximity to Rudin during the days surrounding Ron Rudin's disappearance. Cantrell told of the secret electronic device Rudin had installed in her husband's office, that she and Rudin had entered Ron Rudin's office after his disappearance to secure some of his financial and business documents, and of statements Rudin made indicating that she had some knowledge of why her husband had disappeared. With only a circumstantial case facing Rudin, diminishing Cantrell's testimony was critical to the defense, yet Amador was unprepared to do this on cross-examination. In fact, Amador only asked Cantrell six questions.

The State continued to present its case and it became obvious to Pitaro that the lack of preparation made it impossible to adequately represent Rudin as lead counsel. On March 15, 2001, Rudin requested a mistrial asserting that Amador was not prepared to continue with the case, which he admitted, and that Pitaro had joined the defense team too late to remedy the situation. Amador admitted his opening statement was inadequate and that he could barely keep his eyes open after giving his opening statement. He further admitted that he could have done a better job interviewing and investigating the State's witnesses, and consulting with and retaining expert witnesses. Pitaro agreed that the defense's case was not ready for trial and concurred that Amador should never have agreed to try the case. Pitaro declared at the hearing on the motion:

> The fundamental problem that we have is this case is not ready to go to trial. For whatever reason it's not ready, it's not ready. That's obvious to any observer of this case, that for the first two weeks this is not the way you try cases and this is not the way you try murder cases. . . . And what we are putting on in front of the world is a farce, and that disturbs me as an attorney. . . . [T]his has become a sham, a farce and a mockery. . . .

The State again expressed concerns about the state of the record, and the representation that Rudin had received. But, it was the State that then led the district court to make a critical legal error. The district court was led to believe that in order to avoid any

problem with double jeopardy attaching, Rudin had to show that declaring a mistrial was a manifest necessity. The defense motion for a mistrial was denied because the district court found that Rudin had not shown sufficient prejudice to establish manifest necessity. However, a showing of manifest necessity is not required when a defendant moves for a mistrial because double jeopardy does not attach.[3] In such a situation as Rudin presented, it was within the district court's discretion to grant a mistrial if a fair trial could not be had.[4] Thus, the district court applied an incorrect legal standard when it denied Rudin's motion for a mistrial.

Further, the district court prematurely used the *Strickland v. Washington*[5] standard to judge the ineffectiveness of Amador; this standard is inapplicable during trial. *Strickland* requires that before relief can be given, it must be shown that an attorney was deficient, and that the result of the trial would probably have been different but for counsel's deficient performance.[6] At this early stage of the trial, there was abundant evidence that Amador's performance was substandard, but there was no result to assess. Therefore, the application of the *Strickland* standard to this situation was another legal error made by the district court, which the majority opinion seems to repeat. The district court was simply called upon to determine, in its discretion, whether Rudin had been prejudiced by Amador's performance and lack of preparation to a point where a fair trial could not be had.

If this case had been a professional prizefight, they would have stopped the contest. Yet, the district court continued with the case and required an unprepared defense to soldier on, investigating as the case was being presented. As investigator Tom Dillard, a former detective for the Las Vegas Metropolitan Police Department, stated: ''I can say without hesitation that we . . . literally prepared the defense for the case hour by hour and day by day.'' When the

---

[3]*See Benson v. State,* 111 Nev. 692, 695-96, 895 P.2d 1323, 1326 (1995) (observing that a defendant's motion for, or consent to, a mistrial removes any double jeopardy bar to reprosecution unless the prosecutor intended to provoke a mistrial); *see also United States v. Pollack,* 640 F.2d 1153, 1155 (10th Cir. 1981) (noting that the general rule is that when a defendant in a criminal proceeding moves for a mistrial, he thereby consents to retrial).

[4]*See Mortensen v. State,* 115 Nev. 273, 281, 986 P.2d 1105, 1111 (1999) (noting that reversal is warranted because the district court abused its discretion in denying a motion for a mistrial); *see also People v. Silva,* 21 P.3d 769, 788 (Cal. 2001) (observing that a district court should grant a mistrial when a defendant's chances of having a fair trial have been irreparably damaged); *Bauder v. State,* 921 S.W.2d 696, 698 (Tex. Crim. App. 1996) (noting that a mistrial may be granted when prejudicial events occur during the trial process).

[5]466 U.S. 668 (1984).

[6]*Doyle v. State,* 116 Nev. 148, 154, 995 P.2d 465, 469 (2000) (citing *Strickland,* 466 U.S. at 687-88, 694).

defense complained that it was impossible to do the investigation while the case was in progress, the district court appointed yet another attorney to the defense team.

Reaching the conclusion that Amador was totally unprepared to try this case did not require any advanced legal training—it was obvious to all. Columnist John L. Smith stated it this way:

> It was agonizing to watch.
>
> Anyone who has felt compassion for an animal caught in a steel trap can empathize with the painful predicament defense attorney Michael Amador found himself in Thursday afternoon in District Judge Joseph Bonaventure's courtroom.
>
> Metaphorically speaking, Amador was attempting to chew off his paw to escape the trap that is the Margaret Rudin murder trial. It's a trap he had set for himself. Rudin is accused of the December 1994 murder of her husband, real estate developer Ron Rudin.
>
> Amador tried in the most tactful language he could muster to admit to the court that he was hopelessly in over his head and needed Bonaventure to grant a mistrial. Courtroom observers had seen that day coming for weeks.
>
> Amador, once a top local prosecutor and more recently a successful defense lawyer, appeared overwhelmed by this case, which he accepted without the usual fee arrangement. Some of his motions to the court were riddled with typographical errors and confusing digressions. Some of his rhetoric wandered so far off point that earlier last week Bonaventure finally lost his patience. When Amador wasn't frustrating the judge, he was falsely accusing a prosecutor of lying.
>
> In an effort to protect Rudin's rights to a fair trial, a few weeks ago Bonaventure persuaded respected criminal attorney Tom Pitaro to join Amador on the defense. Private investigators Michael Wysocki and Tom Dillard were hired, but it was way too late.
>
> During trial, the attorneys had met with Bonaventure more than once to discuss Amador's preparedness and presentation. By Wednesday, Rudin had finally heard enough and wanted to make a change.
>
> It was, after all, her name on the criminal docket.
>
> Bonaventure didn't allow Amador to exit gracefully.
>
> "Do you know how much money was expended in this case, the thousands upon thousands of dollars?" Bonaventure asked. "Now, all of a sudden, we have three weeks—or nine days of testimony, your client says: 'I want a mistrial.' And you say:

'I've been doing good thus far, but I want a mistrial. I'm not prepared.' "[7]

No defense of an open charge of murder should be required to investigate, prepare for, and try the case all at the same time. Basic considerations of fair play and due process require that every defendant charged with a serious crime be provided a competent attorney who is given sufficient time to prepare the defense.[8] When it became obvious that the defense was not ready for trial and Rudin could not receive a fair trial, the district court judge should have heeded the concerns of both the State and defense counsel and granted a mistrial. The application of the wrong legal standards prevented the district court judge from doing so, and perhaps the concerns over wasted effort and the termination of the nationally broadcasted Court TV program were also factors. But, with this said, I do recognize and appreciate the impossible situation in which the district judge was placed due to Amador's conduct. The district court judge did all he could to attempt to salvage the trial and still provide an adequate defense for Rudin. Unfortunately, the harm had already been done and this trial was not salvageable.

The jury deliberated seven days before returning a verdict of first-degree murder. Shortly after the verdict, a juror held an impromptu press conference on the courthouse steps and repeated the words Amador used in his opening statement: "In his opening remarks . . . Amador said, 'This is a great day.' I submit to you that today . . . is a great day. Ronald Rudin, his family and the people of the great state of Nevada can [take] comfort in the fact that justice was served today." There can be no doubt that Amador's opening statement prejudiced the defense, and it remained with the jury until the end of the trial.

*Motion for new trial and Amador's conflict of interest*

Following Rudin's trial, the defense team filed a motion for a new trial and a fuller picture of Amador's failure to prepare this case emerged. Amador had sought the appointment to defend Rudin without pay, pro bono, believing it would be the big case he needed to boost his legal career. He told numerous people that this

---

[7]John L. Smith, *Attempt at a Graceful Exit from the Rudin Trial Painful to Watch,* Las Vegas Review Journal, Mar. 18, 2001.

[8]*See Young v. District Court,* 107 Nev. 642, 649, 818 P.2d 844, 848 (1991) ("Defense counsel assumes a vital role in the preservation of a constitutional system of criminal justice that guarantees fundamental fairness to defendants who stand in jeopardy of losing life, liberty or property."); *see also Brescia v. New Jersey,* 417 U.S. 921, 924 (1974) (Marshall, J., dissenting from denial of certiorari) (observing that opportunity for adequate preparation is an absolute prerequisite for defense counsel to fulfill his constitutionally assigned role of seeing to it that the State proves its case and raising any available defenses).

was his big break, and he even repeated this in his opening statement. He agreed to defend Rudin in the criminal proceeding, and at the same time, filed a lawsuit on behalf of Rudin to cancel an agreement Rudin allegedly made with an individual to write a book about the murder case. When the district attorney's office heard rumors that Rudin and Amador might be receiving media income from the case and that Rudin was not truly indigent, it brought this information to the district court's attention. At the informal hearing in chambers on March 5, 2001, Amador and Rudin assured the district court that there was no such income being received. The district court judge seemed less concerned about the potential conflict of interest that might be present if Amador was involved in a book deal, and more concerned with whether anyone was receiving money from a book deal. Indeed, the district court judge instructed Amador to inform him if Rudin received any money from a book deal.

Amador apparently did little work on the case during the months after his appointment, except to create a website to broadcast the daily events of the upcoming trial, and then in November 2000, he left for a one-month European vacation. A new office assistant named Annie Jackson arrived about that time, and when Amador returned, he instructed Jackson to put the volumes of materials the office had received about the Rudin case in binders. It was her firm belief that Amador had not reviewed these voluminous files, and Pitaro expressed the same feeling about the materials during trial. Additionally, review of the records by Pitaro and the investigators became more difficult when Amador took many of the volumes of material with him when he checked into the 4 Queens Hotel at the beginning of trial. Besides performing little or no review of the voluminous documents, when Rudin was transported to Amador's office for the purpose of preparing her defense, no preparation occurred. According to Jackson:

> The first time Margaret was transported to the office, Mr. Amador ordered a bunch of food. Tom Pitaro came over and a writer from New York by the name of John Connelly was also there. It was just a social gathering. No work whatsoever with respect to the defense of the case was performed.
>
> I later learned John Connelly writes for the National Enquirer, and had done an article on Margaret Rudin back in December. This article had been done through Michael Amador's connection with Mr. Connelly. I also learned that Michael Amador had some sort of an affiliation with WeaselSearch.com, which is the website that covered the entire trial.
>
> The second week that Margaret Rudin was transported to our offices, 48 Hours was there and all their cameras were

rolling. Nothing was accomplished with respect to preparing for the trial. 48 Hours was interviewing Margaret Rudin the entire time.

Ms. Rudin expressed her displeasure on the second occasion, as she wanted us to start working on her case. Mr. Amador kept telling Margaret that they would get to her case the next week.

As I recall, the third week Margaret was transported to our offices, Mr. Amador had arranged for a gentleman to come over to dye Margaret's hair, cut it, and do her make-up. This was, without exaggerating, another insane free for all. Again, 48 Hours was there and Mr. Amador appeared, at least to me, more concerned with the media attention than with adequate preparation of Margaret Rudin's case.

Jackson also elaborated on Amador's personal problems. She confirmed that his wife and mother-in-law left the office a month before trial and that Amador then stopped coming to the office and apparently began cavorting with other women. Jackson explained:

Mr. Amador spent most of his evenings at strip bars, and in the company of strippers. In fact, on many occasions, he bragged about the many strippers he was dating. Worse, the strippers were calling and even coming over to the office during business hours when I was there. I personally recall one occasion when Mr. Amador even allowed one such stripper to go through and separate Margaret Rudin's documents.

Jackson indicated that while preparing for trial, she saw several media rights agreements signed by Rudin, giving all media rights to Amador. In her testimony, Jackson stated that the day Amador was fired and returned to the office, he demanded that Jackson get the media contracts and put them in the safe. She indicated that she had seen the three book and media contracts between Rudin and Amador, but that Amador eventually took them. With regard to Amador denying that he had media contracts with Rudin, Jackson said that was a lie:

There is no other way to say the following: when Mr. Amador told the court that he did not have any book or movie contracts, he was lying. Michael Amador does have book contracts and movie contracts regarding the Margaret Rudin case. When we returned to the office after Mr. Amador made those false representations to the court, he asked me to grab all of the contracts so that he could put them in his little safe in the back closet. He told me, ''I don't want anyone to find out that I have these, then I'm sure they'll be investigating and looking for these.''

After hearing Jackson's testimony, the district court should have been convinced of the need for a new trial. The evidence certainly indicated that Amador secured media rights while representing Rudin, which was a violation of the Nevada Rules of Professional Conduct.[9] Amador was clearly more interested in obtaining information for his book and getting media attention than in developing Rudin's defense. In fact, Jackson testified that Amador did not turn over several of Rudin's files, containing diaries, witness statements, and pictures, to the public defender's office because he thought he might need the information in the future. Amador's behavior made it virtually impossible for Rudin to receive a fair trial, even with the addition of Pitaro to the defense team.

The effort Amador put into this case was largely driven by his desire for publicity and future media revenues. Doing this case pro bono put a serious economic strain on his solo law practice and most of his staff left the month before trial. Amador's personal life was in shambles, and it appears as if he was having a major midlife crisis. All of these problems became Rudin's problems, as was so painfully shown at trial.

This court has held that a defendant is entitled to legal representation free from any conflict of interest with his or her attorney.[10] The majority correctly notes that Amador had a conflict of interest in this case, but then arrives at the surprising conclusion that the record shows that Rudin was adequately represented. Coupling the inherent prejudice created by being represented by an attorney with a conflict, along with the patent failures to prepare for a major murder case, failures which were very obvious as the trial proceeded, I can come to no other conclusion but that the prejudice was substantial and ongoing. The appropriate conclusion should be similar to the one reached in *Clark v. State,* cited by the majority with approval, which states that an attorney's actual and substantial conflict of interest requires a reversal of the conviction and a new trial.[11]

The majority opinion indicates that the defense team was able to provide Rudin with the basics at trial, and that is true. The defense did make an opening statement, cross-examine witnesses, call witnesses on Rudin's behalf, and make a final argument, but there

---

[9]*See* SCR 158(4) ("Prior to the conclusion of representation of a client, a lawyer shall not make or negotiate an agreement giving the lawyer literary or media rights to a portrayal or account based in substantial part on information relating to representation."); *see also* Model Rules of Prof'l Conduct R. 1.8 cmt. 3 (1998) (observing that an agreement by which a lawyer acquires literary or media rights concerning the conduct of the representation creates a conflict between the client's interests and lawyer's personal interests).

[10]*Coleman v. State,* 109 Nev. 1, 3, 846 P.2d 276, 277 (1993).

[11]108 Nev. 324, 326, 831 P.3d 1374, 1376 (1992).

was no way the defense could overcome the prejudice created by Amador in the early stages of the trial. The fact that a defendant's attorney is participating in every aspect of the trial does not necessarily mean that the representation is adequate.

In fact, it was not until during the trial that two important facts were discovered by the defense team that countered two key points asserted by the State early in the trial. The State presented evidence that a large trunk that Rudin possessed had been purchased from a specific dealer and was missing from her antique shop after Ron's disappearance—the inference being that Ron was carted off by Rudin in the trunk. The State also made much of the fact that Rudin did not report Ron's disappearance and took no action to discover his whereabouts when he disappeared. These two points were driven home by the State early in the trial, and along with the other inculpating evidence, provided great momentum for the State's case. Sometime during the trial, the defense team located the person who sold the trunk to Rudin and established that it was not a large humpback trunk, but one that was much too small to fit a corpse inside. The defense also located Barbara Orcutt, who indicated that Rudin was indeed concerned about Ron's disappearance and had asked her right after his disappearance to organize a search in the Mt. Charleston area, where she believed Ron might have been. The State apparently had this information, but did not share it with the defense.

Toward the end of trial, this newly discovered evidence was brought to the district court's attention, and the defense was permitted to present it. Once again, Rudin's defense was put in a position of finding important evidence after the trial began and then belatedly presenting it to the jury. It is unrealistic to think that the jurors could have put out of their minds all the evidence and adverse events, including the continual admonishment of defense counsel by the district court judge; the bizarre opening statement; the constant continuances and delays throughout the trial, which I am sure were held against the defense; and the belated presentation of important evidence. These harmful events resulted from Amador's conflict of interest and lack of preparation and now require reversal of this case.

## CONCLUSION

I believe there is sufficient evidence in the record, without the necessity of post-trial proceedings, to establish that the defense was totally unprepared to try this case and that Amador had a substantial conflict of interest with his client. This was prejudicial to Rudin, and the result reached was unreliable.

In closing, I would like to observe that the practice of a district court judge meeting with a defendant without her attorneys being present is a dangerous one. The first meeting the district court

judge had with Rudin is a good example. The district court judge asked Rudin if she wanted a mistrial, and she said no in large part because she was afraid of being reassigned to the public defender's office. But this decision should be made by a client after consultation with a conflict-free attorney. Rudin also expressed concern that several favorable witnesses residing in Mexico had not been subpoenaed, to which the district court judge responded that he had not been contacted about expenses for lay witnesses, but would consider a reasonable request for such expenses. Again, a conversation best conducted with her attorneys present. A judge should only meet with a defendant without attorneys present in rare situations where an emergency is presented.[12] Compliance with this rule should be scrupulously observed.

For the reasons expressed, I would reverse Rudin's conviction and remand the case for a new trial.

---

[12]NCJC Canon 3B(7)(a) (stating that ''[w]here circumstances require, ex parte communications for . . . emergencies . . . are authorized'').