198 P.3d 839 (2008)
Avram NIKA, Appellant,
v.
The STATE of Nevada, Respondent.
No. 46586.
Supreme Court of Nevada.
December 31, 2008.
*842 Richard F. Cornell, Reno; Glynn B. Cartledge, Reno, for Appellant.
Catherine Cortez Masto, Attorney General, Carson City; Richard A. Gammick, District Attorney, and Terrence P. McCarthy, Deputy District Attorney, Washoe County, for Respondent.
Catherine Cortez Masto, Attorney General, and Victor-Hugo Schulze II, Senior Deputy Attorney General, Carson City, for Amicus Curiae Office of the Attorney General for the State of Nevada.
Franny A. Forsman, Federal Public Defender, and Michael Pescetta, Assistant Federal Public Defender, Las Vegas, for Amicus Curiae Federal Public Defender's Office for the District of Nevada.
Danny A. Silverstein, Las Vegas, for Amicus Curiae Nevada Attorneys for Criminal Justice.
BEFORE THE COURT EN BANC.

OPINION
HARDESTY, J.
The primary issue in this appeal concerns a jury instruction defining premeditation, commonly referred to as the Kazalyn[1] instruction, and our decision in Byford v. State,[2] which addressed specific concerns about that instruction. Appellant Avram Nika challenges our subsequent decisions that Byford announced a new rule with prospective effect.[3] In considering his argument, we reexamine whether our decision in Byford constituted a clarification of existing law or a change in the law respecting the meaning of the mens rea for first-degree murder. We hold that Byford announced a change in state law that applies prospectively to murder convictions that were not final when Byford was decided. Nika's conviction was final before Byford was decided. Consequently, we conclude that Nika's trial and appellate counsel were not ineffective for failing to challenge the Kazalyn instruction as that instruction was a correct statement of the law at the time of his trial.
Nika raises several other issues on appeal, none of which we conclude warrant relief. Accordingly, we affirm, the district court's order dismissing Nika's post-conviction petition for a writ of habeas corpus.

FACTS AND PROCEDURAL HISTORY
Nika left California in his brown Chrysler around noon on August 26, 1994. Sometime later that day Nika's car broke down on I-80 about 20 miles east of Reno, Nevada. Several people saw Nika standing by his car along the highway. Two motorists stopped to help, but Nika refused assistance other than to ask for a tow truck to be sent to his location. Another motorist, Edward Smith, left Reno in his silver BMW at 8 p.m. that night to return to his home in Fallon, Nevada. Other drivers on I-80 that night saw two cars and two men who matched the descriptions of Nika and Smith and their respective vehicles. Despite having plans with his family, Smith never made it home.
The following day, Smith's body was found by a hillside off of I-80, lying next to railroad tracks and a barbed wire fence. Smith had been shot in the forehead. Smith's pants were hanging from the fence, and his wallet with money still in it was lying next to his body. Drag marks in the dirt extended from Smith's body to a Chrysler parked off of I-80. A rock with pooled blood on it was found *843 by the Chrysler's rear passenger side tire. By the front tire, a bullet, a shell casing, and human hair were found on a path of dirt that was stained red.
An autopsy revealed that Smith had suffered three blunt trauma wounds and skull fractures on the back of his head. At least one of the three wounds occurred while Smith was lying face down. On Smith's forehead was a single contact bullet wound that was consistent with the gun being placed directly on his skin when it was fired. Smith suffered lacerations on his face and other wounds consistent with being dragged. The medical examiner opined that the gunshot wound to Smith's head caused his death.
Two days after Smith's body was discovered, the police located Nika in Chicago, Illinois, and observed him exiting Smith's BMW. Nika was arrested for possession of a stolen vehicle. Nika at first denied any knowledge of the BMW, but he later told police that the car belonged to a friend whose name he did not know. When police investigators informed Nika that the BMW was involved in a murder outside of Reno, he changed his story several more times to conform to information that the police revealed about the vehicle and the murder. During a search in Chicago, the police found blood splatter on several items belonging to Nika. DNA test results revealed that the blood splatter was consistent with Smith's blood.
After being extradited from Illinois to Nevada, Nika was incarcerated with Nathaniel Wilson at the Washoe County Jail. According to Wilson, Nika confessed to him the details about Smith's murder. Namely, Nika said that his car broke down, and Smith, who had stopped to help him, called him a vulgar name. Nika hit Smith on the head with a crowbar. While Smith was lying on the ground, Nika shot him in the head and then tried to hide his body. Nika told Wilson that he killed Smith because "he needed to get to Chicago." When Smith's BMW would not start, Nika took the battery out of his own car and put it in the BMW.
A jury found Nika guilty of first-degree murder with the use of a deadly weapon. At the conclusion of the penalty hearing, the jury found one aggravating circumstance that the murder was committed at random and without apparent motive  and no mitigating circumstances. The jury sentenced Nika to death.
This court affirmed Nika's conviction and death sentence on appeal.[4] While Nika's direct appeal was pending, this court issued an order in August 1995 pursuant to a former provision of Supreme Court Rule 250 that required the district court to appoint Nika new counsel and to hold an evidentiary hearing regarding the effectiveness of Nika's trial counsel. After the evidentiary hearing, the district court concluded that Nika's trial counsel were not ineffective. This court affirmed the district court's decision.[5]
Nika subsequently sought post-conviction relief. In Nika's first post-conviction proceeding, the district court granted the State's motion to dismiss all but one claim in the post-conviction petition for a writ of habeas corpus. That claim related to Nika's contention that the State withheld an agreement with jailhouse informant Wilson. After an evidentiary hearing on that matter, the district court denied that claim as well. On appeal from the district court's ruling on Nika's post-conviction petition, this court declined to rely on its previous ruling related to Nika's SCR 250 hearing, concluding that Nika did not have a full and adequate opportunity to raise his claims in that proceeding. We affirmed the district court's denial of relief based on Nika's claim relating to jailhouse informant Wilson. However, we concluded that the district court's order dismissing Nika's remaining claims was deficient. Consequently, this court remanded the matter for further proceedings.
On remand, the district court allowed Nika to revise his supplemental petition. The State filed a motion to dismiss the petition, which the district court granted. This appeal followed.

*844 DISCUSSION

Nika contends that the district court erred by dismissing, without an evidentiary hearing, his claims of ineffective assistance of trial and appellate counsel respecting the guilt and penalty phases of his trial and that the district court's erroneous ruling mandates reversal of his conviction and death sentence. Nika is entitled to an evidentiary hearing if he "asserts claims supported by specific factual allegations not belied by the record that, if true, would entitle him to relief."[6] As explained below, we conclude that the district court did not err by summarily dismissing Nika's post-conviction claims.

Guilt phase claims

Claims of ineffective assistance of counsel
Nika contends that the district court erred by dismissing his claims of ineffective assistance of trial counsel related to the guilt phase of his trial. "A claim of ineffective assistance of counsel presents a mixed question of law and fact, subject to independent review."[7] "However, the district court's purely factual findings regarding [claims] of ineffective assistance of counsel are entitled to deference on subsequent review by this court."[8] A claim that counsel provided constitutionally inadequate representation is subject to the two-part test established by the United States Supreme Court in Strickland v. Washington.[9] To prevail on a claim of ineffective assistance of trial counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced the defense.[10] A defendant must demonstrate prejudice by showing a reasonable probability that but for counsel's errors, the result of the trial would have been different.[11] "The defendant carries the affirmative burden of establishing prejudice."[12] A court need not consider both prongs of the Strickland test if a defendant makes an insufficient showing on either prong.[13]

Premeditation instruction
The principal issue in this appeal concerns Nika's challenge to the premeditation instruction, commonly referred to as the Kazalyn instruction. Nika argues that the district court erroneously dismissed his claims that the premeditation instruction was improper and that trial counsel were ineffective for failing to challenge the instruction. Nika contends that this court's decision in Byford v. State,[14] which considered the Kazalyn instruction, clarified existing law respecting the elements of first-degree murder, and therefore Byford applies to his case. Consequently, according to Nika, his first-degree murder conviction must be reversed due to the alleged improper premeditation instruction and resulting prejudice. Nika argues that his position is supported by the Ninth Circuit Court of Appeals' decision in Polk v. Sandoval,[15] which relied on Byford and, contrary to this court's decision in Garner v. State,[16] determined that the Kazalyn instruction amounts to constitutional error. Resolving Nika's claims requires us to review our pre-Byford decisions respecting premeditation instructions and discuss our conclusions in Byford and Garner.
*845 Since the days of territorial law, first-degree murder in Nevada has included killings that are "willful, deliberate, and premeditated."[17] The meaning of the terms or the phrase as a whole has never been addressed legislatively. Rather, as this court observed in its 1980 decision in Ogden v. State, there is no indication that the terms have anything other than their ordinary dictionary meanings.[18] But those ordinary dictionary meanings have varied. In different sources and at different times, the terms have been used to define each other, suggesting synonyms or overlapping connotations,[19] or as similar concepts of mental operation differing in degree.[20]
Similarly, the meaning of the terms and the phrase "willful, deliberate, and premeditated" has evolved through judicial interpretation. For example, in its 1877 decision in State of Nevada v. Harris, this court generally approved of an instruction that explained the class of first-degree murder based on a "willful, premeditated and deliberate killing."[21] The instruction considered in Harris informed the jury that to fit this class of first-degree murder, the unlawful killing must be the result of a "deliberate and preconceived intent to kill."[22] The instruction further informed the jury that "[t]he unlawful killing must be accompanied with a deliberate and clear intent to take life" and "[t]he intent to kill must be the result of deliberate premeditation," "formed upon a preexisting reflection, and not upon a sudden heat of passion sufficient to preclude the idea of deliberation."[23]
Three years later, in State of Nevada v. Lopez, this court observed that the words "premeditation" and "deliberation" "are of similar import, each being held to imply the other."[24] As a result, the court concluded that it made "no difference whether they are used conjunctively or disjunctively" in an instruction defining second-degree murder as an unlawful killing with malice aforethought "`but without the admixture of premeditation or deliberation.'"[25]
Fifteen years later, in State v. Wong Fun, this court considered the terms "willful, deliberate and premeditated" and, although the court did not specifically define the terms, it concluded that they are not synonyms for "malice aforethought."[26] This court repeated this distinction between "malice" on the one hand and "deliberation" and "premeditation" *846 on the other almost a century later in its 1981 decision in Hern v. State, observing that "[m]alice is not synonymous with either deliberation or premeditation" because "[t]o view it otherwise would obliterate the distinction between the two degrees of murder."[27] The court in Hern thus explained that "malice aforethought and premeditated homicide is murder in the first degree" but that "intentional homicide without premeditation is, in the absence of legally cognizable provocation or mitigating circumstances, murder in the second degree."[28] In a final comment, the Hern court stated that "[i]t is clear from the statute that all three elements, willfulness, deliberation, and premeditation, must be proven beyond a reasonable doubt before an accused can be convicted of first degree murder."[29] But like the Wong Fun court a century earlier, the Hern court did not specifically define "premeditation" and "deliberation." And when the Hern court considered the sufficiency of the evidence that the victim's death was the result of a willful, deliberate, and premeditated act by the defendant, the court focused on the "intent to kill" and "premeditation," without any discussion of "deliberation" as a separate and distinct concept.[30]
When this court decided Kazalyn in 1992, it was not asked to distinguish between "premeditation" and "deliberation." Instead, the issue presented was whether the jury instruction on premeditation sufficiently distinguished between premeditation and malice aforethought[31]as explained above, both Wong Fun and Hern had held that premeditation and malice are not synonymous. The court determined that the premeditation instruction, which later became known as the Kazalyn instruction, and the malice instruction were sufficiently distinct.
This court in Kazalyn did not address the specific language in the instruction stating that "[i]f the jury believes ... that the act constituting the killing has been preceded by and has been the result of premeditation ..., it is willful, deliberate and premeditated murder."[32] The court addressed that language in a decision a few months after Kazalyn. In Powell v. State, the court considered a challenge to the same instruction used in Kazalyn on the ground that in the absence of instructions defining "willful" or "deliberate," the jury was misled to believe that the State only had to prove that the defendant acted with premeditation.[33] In rejecting that challenge, this court observed that two prior decisionsBriano v. State[34] and DePasquale v. State[35]used "premeditated and deliberate" as a single term and that other courts had treated the terms "willful, deliberate, and premeditated" as "a single phrase, meaning simply that the actor intended to commit the act and intended death to result."[36] On these grounds, this court concluded that as long as the jury is properly instructed on premeditation, "it is not necessary to separately define deliberateness or willfulness."[37] This court then held that the premeditation instruction used in the casethe Kazalyn instructionprovided an accurate definition of premeditation. During the eight years between Powell and Byford, this court repeatedly and consistently rejected challenges to the Kazalyn instruction and the decision in Powell premised on the ground that the terms "willful" and "deliberate" were not *847 clarified for the jury as separate terms.[38]
As pointed out in Powell, Nevada was not alone in the view espoused by that case and later cases that the terms "willful," "deliberate," and "premeditated" need not be separately defined, but rather those terms constituted a single phrase. For example, as early as 1918, West Virginia treated the words "premeditatedly" and "deliberately" as synonyms.[39] The Alabama courts reached the same conclusion that "`[p]remeditation' and `deliberation' are synonymous terms, which, as elements of first degree murder, mean simply that the accused, before he committed the fatal act, intended that he would commit the act at the time that he did, and that death would be the result of the act."[40] Maryland, in Brown v. State, reached a similar conclusion, stating that "[t]he trilogy of terms [willful, deliberate, and premeditated] connotes the same general ideathe intention to kill."[41] The Brown court further reasoned that "[t]he use of all three words seems to us to serve no purpose other than to shroud the intention in an aura of redundancy so as to convey the seriousness of the matter."[42] More recently, the Mississippi Supreme Court "held that malice aforethought, premeditated design and deliberate design all mean the same thing."[43]
In Byford, however, this court concluded that "willfulness," "deliberation," and "premeditation" are distinct elements of the mens rea required for this category of first-degree murder.[44] In doing so, the court abandoned the line of cases starting with Powell[45] and including Greene v. State[46] because those cases had reduced "deliberation" to a synonym of "premeditation" and then had further reduced "premeditation and deliberation" to "intent."[47] Although the court indicated that instructions defining these separate words are not required because they are used in the first-degree murder statute "`in their ordinary sense,'"[48] this court concluded that if a jury is instructed on the meaning of one of the terms, then it also must be instructed on the meaning of the other two terms.[49] Because the Kazalyn instruction defining premeditation "underemphasized the element of deliberation,"[50] this court set forth instructions with distinct definitions for willfulness, deliberation, and premeditation. Ultimately, however, this court rejected Byford's challenge to the Kazalyn instruction "as a basis for any relief for Byford."[51]
A few months after Byford, this court considered whether its decision in that case required reversal of a first-degree murder conviction that was not yet final when Byford *848 was decided.[52] In Garner v. State, the court explained that while Byford concluded that the Kazalyn instruction did not "fully define `willful, deliberate, and premeditated'" and provided instructions "for future use," it "does not hold that giving the Kazalyn instruction constituted error, nor does it articulate any constitutional grounds for its decision."[53] The court concluded that "[u]se of the Kazalyn instruction in trials which predate Byford does not constitute plain or constitutional error" and the new Byford instructions do not "have any retroactive effect on convictions which are not yet final: the instructions are a new requirement with prospective force only."[54] In rejecting Garner's claim that Byford "has retroactive effect and should be applied to convictions which have not yet become final," this court concluded that the general rule stated in Griffith v. Kentucky[55] only requires that a newly declared constitutional rule be applied to cases pending on direct appeal.[56] The court then concluded that Griffith did not apply to Byford because Byford did not "invoke any constitutional mandate in directing that its new instructions be given in future cases, so there is no constitutional requirement that this direction have any retroactive effect."[57] Subsequently, in the post-conviction arena, we rejected claims of ineffective assistance of counsel concerning the Kazalyn instruction, observing that Byford had no retroactive application and that the use of that instruction in cases predating Byford provides no ground for relief.[58]
Nika asks this court to revisit our holding in Garner that Byford operates as a new nonconstitutional rule in light of the Ninth Circuit Court of Appeals' decision in Polk v. Sandoval.[59] Although we are not obligated to follow Polk, we take this opportunity to address that decision in light of the considerable interest that case has generated in cases pending before this court.
In Polk, the Ninth Circuit disagreed with this court's conclusion that the use of the Kazalyn instruction does not involve constitutional error. Rather, the Ninth Circuit held that the use of the Kazalyn instruction violated Polk's federal constitutional right to due process because the instruction "relieved the State of its burden of proving every element of first-degree murder beyond a reasonable doubt."[60] Considering Byford, the Ninth Circuit observed that this court had "reaffirmed" that "`all three elements, willfulness, deliberation, and premeditation, must be proven beyond a reasonable doubt before an accused can be convicted of first degree murder'" and therefore "[i]t is not sufficient for the killing simply to be premeditated."[61] Based on this reasoning, the Ninth Circuit concluded that the Kazalyn instruction "is clearly defective" because in telling the jury that a killing that is the result of premeditation is willful, deliberate, and premeditated murder, the instruction "defined away `willful' and `deliberate' by equating them with `premeditated'" and thereby "relieved the state of the burden of proof on whether the killing was deliberate as well as premeditated."[62] The Ninth Circuit then determined that this court "erred by conceiving of the Kazalyn instruction issue *849 as purely a matter of state law."[63] Instead, reasoned the Ninth Circuit, "the question of whether there is a reasonable likelihood that the jury applied an instruction in an unconstitutional manner is a `federal constitutional question"[64] According to the Ninth Circuit, the Kazalyn instruction could be applied in an unconstitutional manner because "an instruction omitting an element of the crime and relieving the state of its burden of proof violates the federal Constitution."[65]
The fundamental flaw, however, in Polk's analysis is the underlying assumption that Byford merely reaffirmed a distinction between "willfulness," "deliberation," and "premeditation." It was based on that assumption that Polk concluded that the Kazalyn instruction was erroneous and that the instructional error violated the federal Constitution by omitting an element of the offense. That underlying assumption ignores our jurisprudence.
We take this opportunity to reiterate that Byford announced a change in state law. As the Supreme Court has indicated, the question of whether a particular state court interpretation of a state criminal statute constitutes a change inrather than a clarification ofthe law is a matter of state law.[66] It is thus for this court to determine whether a decision of this court changed or merely clarified state law. In the context of retroactivity analysis, we have defined a rule as being "new when it overrules precedent, disapproves a practice sanctioned by prior cases, or overturns a long-standing practice uniformly approved by lower courts."[67] Similar principles are relevant to whether a decision effected a change in the law. Until Byford, we had not required separate definitions for "willfulness," "premeditation," and "deliberation" when the jury was instructed on any one of those terms. And the court had approved of the Kazalyn instruction and rejected challenges to that instruction on the grounds that it failed to distinguish between premeditation and deliberation.[68]Byford "abandoned" that precedentPowell and its progeny.[69] Under the circumstances, Byford was unforeseeable. As this court explicitly held in Garner, Byford announced a new ruleit changed the law.[70] And to the extent that any language in Garner could be interpreted otherwise,[71] it was dicta and we *850 hereby disavow it. Rather, we affirm the holding in Garner that Byford announced a change in the law. As such, the Kazalyn instruction correctly reflected Nevada law before Byford.
Despite our disagreement with the assumption underlying the decision in Polk, we acknowledge that the change effected by Byford properly applied to that case as a matter of due process. The United States Supreme Court has indicated that for purposes of due process, the relevant consideration "is not just whether the law changed" but also "when the law changed."[72] Thus, if the law changed to narrow the scope of a criminal statute before a defendant's conviction became final, then due process requires that the change be applied to that defendant.[73] In such cases, retroactivity is not at issue; rather, due process requires that the conviction be set aside if required by the change in the law.[74] In this respect, our decision in Garner erroneously afforded Byford complete prospectivity because as a matter of due process, the change effected in Byford applies to convictions that were not yet final at the time of the change. Polk involved such a conviction. This case, however, does not.
Because Nika's conviction was final when Byford was decided, whether the change effected in Byford applies to Nika is a matter of retroactivity analysis. This court previously has held that Byford has no retroactive application on collateral review.[75] We reaffirm that decision today.
In Colwell v. State, we detailed the rules of retroactivity, applying retroactivity analysis only to new constitutional rules of criminal law if those rules fell within one of two narrow exceptions.[76] One year later, our decision in Clem v. State reiterated Colwell's holding, explaining again that retroactivity analysis is relevant only when considering a new constitutional rule and that if a new rule does not implicate constitutional concerns, that rule will not apply retroactively.[77] We reaffirm our decisions in Clem and Colwell and maintain our course respecting retroactivity analysisif a rule is new but not a constitutional rule, it has no retroactive application to convictions that are final at the time of the change in the law.[78]
Our decision in Byford to change Nevada law and distinguish between "willfulness," "premeditation," and "deliberation" was a matter of interpreting a state statute, not a matter of constitutional law. Nothing in the language of Byford suggests that decision was grounded in constitutional concerns, and Garner expressly stated that giving the Kazalyn instruction did not constitute constitutional error because "Byford [did] not invoke any constitutional mandate in directing that its new instructions be given in future cases."[79] Our conclusion that the interpretation and definition of the elements of a state criminal statute are purely a matter of state law is reinforced by the fact that jurisdictions differ in their treatment of the terms "willful," "premeditated," and "deliberate" for first-degree murder. As explained earlier, several jurisdictions treat these terms as *851 synonymous while others, for example California[80] and Tennessee,[81] ascribe distinct meanings to these words. These different decisions demonstrate that the meaning ascribed to these words is not a matter of constitutional law. Because Byford announced a new rule and that rule was not required as a matter of constitutional law, it has no retroactive application to convictions, like Nika's, that became final before the new rule was announced.
With this backdrop, we address Nika's specific claims that trial counsel were ineffective for failing to challenge the Kazalyn instruction. To succeed on a claim of ineffective assistance of trial counsel, Nika must demonstrate that counsel's acts or omissions were deficient and that prejudice resulted.[82] Nika's claims fail on the first prong of this test. Because Byford constitutes a change in state law, trial counsel had no basis upon which to challenge the Kazalyn instruction as it represented a correct statement of the law at the time of Nika's trial. And counsel's failure to anticipate a change in the law does not constitute ineffective assistance of counsel even where "the theory upon which the court's later decision is based is available, although the court had not yet decided the issue."[83] Consequently, Nika's claim of ineffective assistance based on the Kazalyn instruction lacks merit.[84]

Malice instruction
Nika contends that the district court erred by dismissing his claim that trial counsel were ineffective for failing to object to the jury instruction defining malice, which provided the statutory definitions of express and implied malice.[85] In particular, Nika asserts that the instruction inadequately defined malice aforethought and created a mandatory presumption of implied malice, allowing the jury to find malice solely on the basis that the jurors believed he was a bad person. We rejected a similar challenge to this malice instruction in Cordova v. State and specifically approved its use.[86] Nika acknowledges Cordova but argues that the decision in that case represents an unreasonable application of federal constitutional law. However, he advances no persuasive reason to depart from Cordova, Because Nika failed to show deficient performance or prejudice, we conclude that the district court did not err by summarily dismissing this claim.

Lesser-related instruction on grand larceny of a motor vehicle
Nika contends that the district court improperly dismissed his claim that trial counsel were ineffective for failing to pursue a lesser-related offense instruction on grand larceny of a motor vehicle. Nika appears to assert that because the State argued that his motive for killing Smith was to steal Smith's *852 vehicle, he was entitled, under Hillis v. State,[87] to a lesser-related offense instruction on grand larceny of a motor vehicle because that offense was "incidental" to the charged offensefirst-degree murder. In Hillis, this court considered whether a procuring agent instruction was required where the defendant was charged with trafficking under the possession provision of NES 453.3395 rather than the sales provision of that statute.[88] The premise of a procuring agent is that "[i]f a person acting solely as an agent of the buyer is not a seller, neither does he possess the controlled substance for the purpose of selling it."[89] This court reasoned that "[e]ven when possession for sale is not specifically alleged, the [procuring agent] instruction may be required where possession was clearly incidental to a contemplated sales transaction initiated by an informant."[90] Noting that "[t]he entire operation in this case centered on a sale," this court concluded that the procuring agent instruction should have been given but the failure to do so was harmless error.[91] Here, we conclude that grand larceny of a vehicle is not closely related, or incidental as contemplated by Hillis, to first-degree murder under the theory advanced in Nika's petition. Consequently, trial counsel had no reason to pursue a lesser-related instruction on grand larceny of a motor vehicle. Because Nika failed to show deficient performance or prejudice, we conclude that the district court did not err by summarily dismissing this claim.

Investigation of case
Nika contends that the district court erred by dismissing his claim that trial counsel were ineffective for failing to conduct an adequate investigation of his case, including failing to consider numerous evidentiary matters and his mental health and childhood history, use services from the Yugoslavian consulate, and allow Nika to speak to the jury to demonstrate his difficulty in speaking English. However, Nika failed to adequately explain how the additional investigation he now proposes would have altered the outcome of his trial. Consequently, the district court did not err by summarily dismissing this claim.

Plea offer
Nika contends that the district court improperly dismissed his claim that trial counsel were ineffective for failing to inform him of a possible plea negotiation. Nika's claim is speculative. He did not allege in his petition that he desired to plead guilty or that trial counsel prevented him from doing so. Nor does Nika contend that counsel failed to approach the State with a specific plea offer or that a specific offer was ever made by the State. Because Nika failed to show deficient performance or prejudice, we conclude that the district court did not err by summarily dismissing this claim.

Suppression of post-arrest statements
Nika contends that the district court erred by dismissing his claim that trial counsel were ineffective in their effort to suppress statements he made to police officers during two separate interviews after his arrest in Chicago. Although trial counsel sought to suppress the statements Nika made during both interviews, they were only successful in suppressing statements made during the second interview on the grounds that Nika had invoked his right to remain silent and had requested counsel. As a result, police officers who conducted the first interview testified about that interview during trial.
Nika argues that trial counsel were ineffective for successfully suppressing statements made during the second interview because those statements would have convinced the jury that the first interview statements should have been suppressed and would have also aided a self-defense theory had his counsel pursued one. Nika failed to adequately substantiate his claim that counsel's actions in this regard were deficient or that even if *853 counsel had acted in the manner he suggests a different outcome at trial would have resulted. Therefore, the district court did not err by summarily dismissing this claim.

Defense theory
Nika contends that the district court improperly dismissed his claim that trial counsel provided ineffective assistance by pursuing a defense that someone else murdered Smith rather than the theory that Nika killed Smith in self-defense. We disagree. Nika told the police that he did not kill Smith and actually purchased Smith's car. And he repeatedly told trial counsel that he did not kill Smith. Further, jailhouse informant Wilson testified that Nika admitted to shooting Smith in the head after striking Smith with a crowbar. Moreover, the medical evidence showed that Smith suffered three blunt trauma wounds and skull fractures on the back of his head, one of which was inflicted while Smith was lying face down. And Smith suffered a single contact bullet wound on his forehead that was consistent with the gun being placed directly on his skin when it was fired. This evidence belies a self-defense theory. Based on Nika's statement to the police denying his involvement in Smith's murder and his repeated denials to counsel, challenging the State's evidence against Nika as insufficient to prove that he was the killer was reasonable. We conclude that Nika failed to adequately substantiate his claim that counsel's decision to pursue a defense that someone other than Nika killed Smith was unreasonable or that but for counsel's decision to pursue this defense, there was a reasonable probability of a different outcome. Therefore, we conclude that the district court did not err by summarily dismissing this claim.

Closing argument
Nika argues that the district court erred by dismissing his claim that trial counsel's closing argument was deficient for a host of reasons and that these deficiencies prejudiced him. We have carefully reviewed counsel's closing argument and Nika's challenges to it. Although counsel's argument was at times disorganized and unfocused, we conclude that any deficiency in this regard did not prejudice Nika for two reasons. First, strong evidence supported Nika's conviction. Second, Nika's other trial counsel provided a separate, subsequent closing argument, which, along with the district court's admonishments to Nika's first counsel, defused any negative impact from the challenged closing argument.[92] Consequently, Nika failed to adequately explain that but for counsel's closing argument a reasonable probability existed that he would not have been convicted of first-degree murder with the use of a deadly weapon. Therefore, we conclude that the district court did not err by summarily dismissing this claim.

Claims of ineffective assistance of appellate counsel
Nika argues that the district court erred by dismissing his claims that appellate counsel was ineffective for failing to challenge the matters underlying his claims of ineffective assistance of trial counsel. A successful claim of ineffective assistance of appellate counsel requires a showing that counsel's performance was deficient and that an omitted issue had "a reasonable probability of success on appeal."[93] For the reasons discussed above, we conclude that Nika failed to adequately substantiate that any of the claims he desired appellate counsel to raise on appeal had a reasonable likelihood of success. Therefore, the district court did not err by summarily dismissing these claims.

Penalty hearing claims

Claims of ineffective assistance of trial counsel

Executive clemency instruction
Nika contends that the district court erred by dismissing his claim that trial counsel were ineffective for failing to object to an executive clemency instruction. Relying on *854 Geary v. State,[94] Nika argues that the instruction was improper because it failed to apprise the jury of the improbability of receiving executive clemency.
In Geary, we held that a clemency instruction identical to the one given in Nika's case was unconstitutional because the instruction, coupled with arguments at the penalty hearing, may have caused the jury to speculate that "a sentence of death was the only way to prevent Geary's eventual release from prison."[95] However, we have also held that the failure to object to the clemency instruction pursuant to Geary did not support a claim of ineffective assistance of trial counsel because Geary announced a new rule that could not have been anticipated by counsel.[96]Geary was decided after Nika's trial, and thus, Nika's counsel cannot be faulted for failing to anticipate that decision.
Moreover, we emphasized in Geary that our decision was limited to the unique circumstances of that case.[97] Since Geary was decided, we have factually distinguished Geary and rejected challenges to the clemency instruction in at least two other capital cases.[98] When doing so, this court looked to whether the prosecutor argued to the jury that the defendant could qualify for parole, whether the defendant had previously had a sentence commuted by the pardons board, and the extent to which the prosecutor emphasized to the jury the defendant's future dangerousness.[99] Here, during closing arguments the prosecutor did not refer to Nika's ability to qualify for parole or a pardon, nor did he directly emphasize that Nika posed a danger to other persons. None of the exceptional circumstances in Geary are present in Nika's case. Because Nika failed to show deficient performance or prejudice, we conclude that the district court did not err by summarily dismissing this claim.[100]

Yugoslavian consulate
Nika argues that the district court erred by dismissing his claim that trial counsel were ineffective for failing to contact the Yugoslavian consulate because had counsel done so, the consulate would have provided "immense help in securing mitigation."[101] Nika failed to identify what mitigation evidence the consulate could have provided other than to assert that the consulate could have explained that the vulgar name Smith allegedly called Nika would have incited the "reasonable passions of an average, reasonable Romanian, Serbian or Yugoslavian." Nika contends that this evidence would have shown in the guilt phase and penalty hearing that Smith's murder was at most a "heat of passion," impulsive killing. However, we conclude that Nika failed to demonstrate that there was a reasonable probability of a different outcome but for counsel's failure to contact the consulate. The evidence showed that Smith suffered three blunt force trauma wounds and skull fractures on the back of his head, one of which was inflicted while Smith was lying down. Smith also suffered a contact bullet wound to his forehead. These wounds evince a calculated, deliberate act. It is not clear what additional evidence the *855 consulate could have provided or that there was a reasonable probability of a different outcome had evidence of Yugoslavian social mores been obtained. Therefore, we conclude that the district court did not err by summarily dismissing this claim.[102]

Claims of ineffective assistance of appellate counsel

Prior bad act evidence
Nika contends that the district court erred by dismissing his claim that appellate counsel was ineffective for failing to challenge on appeal the district court's admission of prior bad act evidence. In particular, he contends that testimony from four witnesses  his mother-in-law, his father-in-law, and two residents from Chicago  was inadmissible during the penalty hearing because it concerned either uncharged prior bad acts or was palpably unreliable.
To the extent Nika contends that appellate counsel should have challenged the evidence as improper because it constituted prior bad act evidence, his claim lacks merit. Evidence of a defendant's character, including uncharged prior bad acts, is admissible in a penalty hearing once the jury has determined that a defendant is "death-eligible, i.e., after [the jury] has found unanimously at least one enumerated aggravator and each juror has found that any mitigators do not outweigh the aggravators."[103] To the extent Nika contends that the challenged testimony was palpably unreliable, he failed to adequately explain why this evidence was defective. Each of the witnesses observed the incidents about which they testified, and Nika had an opportunity to cross-examine them. Because Nika failed to substantiate his claim that appellate counsel's omission was deficient or prejudicial, we conclude that the district court did not err by summarily dismissing this claim.
Nika further argues that even assuming that the challenged bad act evidence was admissible, appellate counsel was ineffective for not challenging on appeal the absence of a limiting instruction explaining the proper use of that evidence. In a rather conclusory fashion, Nika advances two premises supporting his contention that the district court erred by dismissing this claim. First, he contends that the district court concluded that because the case requiring such an instructionHollaway v. State[104] was decided after Nika's trial and appeal, appellate counsel was not ineffective for not challenging the absence of an instruction.[105] Nika contends that Hollaway did not establish a new rule under Teague v. Lane[106] because "[i]t is well entrenched black letter law that the evidence in support of the death penalty must be reliable." Therefore, according to Nika, Hollaway has retroactive application. However, Nika failed to adequately explain under our retroactivity rules[107] why Hollaway should operate retroactively, or even if Hollaway applied retroactively, how the absence of a limiting instruction permitted the jury to consider unreliable evidence in imposing death.
Second, Nika argues that had a prior bad act instruction been given, the jury would have been advised that it could not consider the prior bad acts unless they were proved beyond a reasonable doubt pursuant to Gallego v. State.[108] Although the jury in Gallego was instructed as Nika suggests, the instructional *856 issue raised in that case was unrelated to any requirement that prior bad acts be proved beyond a reasonable doubt. Rather, evidence of uncharged prior bad acts is admissible in a capital penalty hearing so long as it is not "`impalpable or highly suspect.'"[109] As explained above, Nika failed to adequately explain why the challenged evidence was impalpable or unreliable.
We conclude that even if appellate counsel had challenged the omission of a prior bad act instruction on the grounds Nika asserts here, Nika failed to adequately substantiate his claim that the issue had a reasonable probability of success on appeal. Therefore, we conclude that the district court did not err by summarily dismissing this claim.[110]

Mitigation instructions
Nika contends that the district court erred by dismissing his claim that appellate counsel was ineffective for failing to challenge the district court's refusal to give the jury his proffered instruction regarding mitigating circumstances. In particular, he argues that the jury instructions given failed to advise the jury that while it must agree unanimously on the existence of aggravating circumstances, it did not have to agree unanimously on the existence of mitigating circumstances. Nika is correctthe specific instructions informing the jury about its findings and weighing of aggravating and mitigating circumstances did not expressly state that aggravating circumstances had to be found unanimously and that mitigating circumstances did not. Nika asserts that appellate counsel should have challenged the omission of this instruction pursuant to Mills v. Maryland[111] and argued that the failure to instruct constituted plain error. We disagree.
Nika's reliance on Mills is misplaced. In that case, the United States Supreme Court concluded that a substantial probability existed that in an attempt to complete the verdict form as instructed, the jury believed that it could not consider any mitigating evidence unless it unanimously found the existence of a particular mitigating circumstance.[112] Such is not the case here. Nika's jury was instructed that it had to find the existence of any aggravator beyond a reasonable doubt and its verdict must be unanimous. Further, the verdict form began with language"[w]e, the jury"that, as this court concluded in Geary v. State, a reasonable jury would understand "required a unanimous finding of the aggravating circumstances."[113] And no instruction placed constraints on the jury's ability to find mitigating circumstances. As this court has held in similar circumstances, the failure to adequately instruct the jury on unanimity may be harmless where the jury is informed that aggravating circumstances must be unanimously found beyond a reasonable doubt and no constraints are placed on the jury's ability to find mitigating circumstances.[114] On this basis, Nika failed to demonstrate that this instructional error would have had a reasonable probability of success on appeal. Therefore, the district court did not err by summarily dismissing this claim.[115]
*857 Nika also contends that the district court erred by dismissing his claim that appellate counsel was ineffective for failing to challenge the district court's denial of a proposed instruction respecting his lack of a criminal history. At trial, counsel proffered an instruction advising the jury that "as a matter of law, the defendant, Avram Nika, has no significant history of prior criminal activity." The district court rejected the instruction, reasoning that "although there was no evidence of prior criminal convictions by the defendant, there was evidence presented at the penalty proceeding of arguably criminal activity, and therefore this instruction is inaccurate, and in any event the other instructions the Court believes are adequate." The district court did not identify to which instructions it was referring. However, the jury was instructed that any mitigating factor "may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case" and that each mitigating factor must be considered "separately and carefully to determine what weight each should be given." Further, the district court instructed the jury that the law never compels a death sentence. Finally, the jury was provided a verdict form enumerating a number of mitigating circumstances, including that Nika had "no significant history of prior criminal activity." Because Nika failed to substantiate any deficiency or that this claim enjoyed a reasonable probability of success on appeal, we conclude that the district court did not err by summarily dismissing it.[116]

Direct appeal claims
Nika contends that the district court erred by dismissing his claim that the at-random-and-without-apparent-motive aggravating circumstance is invalid. This claim is barred by the doctrine of the law of the case because we considered it in Nika's direct appeal.[117] The doctrine, however, is not absolute, and this court has the discretion to revisit the wisdom of its legal conclusions if warranted.[118] For the reasons explained below, we conclude that the district court did not err by summarily dismissing this claim.
Nika argues that the at-random-and-without-apparent-motive aggravating circumstance is invalid and should be stricken pursuant to our decision in Leslie v. Warden.[119] Nika's jury was instructed that "[a] murder may be random and without apparent motive if the killing of a person was not necessary to complete a robbery." Since the State alleged that Smith's murder was aggravated because Nika committed the murder during the perpetration of a robbery, the jury was instructed on the definition of robbery.[120] This court reasoned that these instructions taken together "required the jury to consider whether Nika needed to murder Smith in order to rob him of his automobile and continue on to Chicago."[121] We concluded that the evidence sufficiently supported "the jury's finding that Nika acted at random and without apparent motive" when he murdered Smith.[122]
Years later, in Leslie, we concluded that "the `at random and without apparent motive' aggravator is inappropriate when it is solely based upon the fact that the killing was unnecessary to complete [a] robbery."[123] We held that this "aggravator only applies to situations in which the defendant selected his victim without a specific purpose or objective *858 and his reasons for the killing are not obvious or easily understood."[124]
We reject Nika's contention that our decision in Leslie renders the at-random-and-without-apparent-motive aggravating circumstance invalid in this case. Nika was not charged with robbery. And although the State argued to the jury that Nika murdered Smith during the perpetration of a robbery, the jury was entitled to conclude that the murder was random and motiveless and reject the State's robbery theory as insufficiently proved for any number of reasons.[125] We conclude that the concerns expressed in Leslie, where the defendant was convicted of robbery as well as first-degree murder, are not present in Nika's case. Furthermore, the evidence presented at trial supports the jury's finding that Nika murdered Smith at random and without apparent motive, unrelated to the taking of Smith's property. Although Leslie altered the scope of the challenged aggravator, Nika fails to persuade us that the doctrine of the law of the case should be abandoned under the particular facts of his case. Consequently, we conclude that the district court did not err by summarily dismissing this claim.[126]

Constitutionality of lethal injection
Nika argues that the district court erred by dismissing his claim that lethal injection constitutes cruel and unusual punishment because a non-physician staff member will be charged with locating his veins and administering the lethal injection. Even assuming that this claim is not procedurally barred or is otherwise properly before us, Nika failed to adequately substantiate his claim that Nevada's lethal injection protocol is unconstitutional on the ground Nika suggests. Therefore, we conclude that relief is not warranted.

District court's standard of review
Nika contends that the district court improperly relied upon Hargrove v. State[127] as the standard for reviewing his post-conviction claims. Rather, he asserts that "[s]trict pleading rules do not apply to habeas petitions." What Nika means by "strict pleading rules" is unclear. However, we stated in Hargrove that claims must consist of more than "bare" allegations and that an evidentiary hearing is mandated only when a post-conviction petitioner asserts specific factual allegations that are not belied or repelled by the record and that, if true, would entitle him to relief.[128]Hargrove is the cornerstone of post-conviction habeas review. Having reviewed Nika's petition, we conclude that the district court did not apply an improper standard of review in resolving his post-conviction *859 petition.[129]

CONCLUSION
We hold that Byford announced a change in state law that applies to cases that were not final when Byford was decided, and we affirm our holding in Garner that Byford did not announce a new rule of constitutional law. However, we overrule Garner to the extent that case declined to apply Byford to cases pending on direct appeal when Byford was decided. Rather, we hold that Byford applies to those cases as a matter of due process because the convictions in those cases were not yet final when the law changed. Because our holding in Byford constitutes a new state rule, we conclude that Nika's trial and appellate counsel were not ineffective for failing to challenge the Kazalyn instruction as that instruction was a correct statement of the law at the time of his trial. Further, we conclude that none of Nika's other claims raised in this appeal warrant relief. Accordingly, we affirm the district court's order dismissing Nika's post-conviction petition for a writ of habeas corpus without conducting an evidentiary hearing.[130]
We concur: MAUPIN, C.J., and GIBBONS, PARRAGUIRRE and DOUGLAS, JJ.
CHERRY, J., with whom SAITTA, J., agrees, concurring in part and dissenting in part:
I concur with the majority that Nika failed to demonstrate that the district court erred by dismissing his claims related to the guilt phase of the trial. I dissent, however, from the majority's conclusion that the district court did not err by dismissing Nika's claim that he received ineffective assistance during the penalty hearing. In my view, trial and appellate counsel were deficient on several grounds, and, considering those deficiencies together, Nika suffered prejudice to a degree warranting a new penalty hearing.
First, trial counsel were deficient for failing to object to the clemency instruction in this case, which this court concluded in Geary v. State was unconstitutional because it may have swayed the jury to speculate that "a sentence of death was the only way to prevent [the defendant's] eventual release from prison."[1] I recognize that this court's holding in Geary was influenced in part by the prosecutor's argument that "there was always a possibility of executive clemency and parole."[2] Nonetheless, I believe that the clemency instruction was misleading and prejudicial in this case when considered along with the other counsel deficiencies explained below.
Second, I believe that trial counsel were ineffective for not seeking assistance from the Yugoslavian consulate to unearth mitigation evidence. The record reveals that Nika is from Romania and spoke only limited English. In my view, educating the jury respecting Nika's cultural background was essential to explaining his character and conduct. The absence of this evidence prejudiced *860 Nika because the jury was left with an incomplete depiction of his character.
Finally, I believe that appellate counsel was ineffective for failing to challenge the district court's refusal to give a proffered instruction advising the jury that it did not have to agree unanimously on the existence of mitigating circumstances. Without that instruction, the jury was left to presume that it could not consider any mitigating evidence unless it unanimously found the existence of a particular mitigating circumstance. Such a presumption is clearly contrary to law[3] and prejudicial.
Although each of the deficiencies described above considered individually do not warrant a new penalty hearing, their cumulative effect prejudiced Nika and rendered his penalty hearing unfair.[4] Therefore, I would reverse the district court's order dismissing the claims of ineffective assistance related to the clemency instruction, consultation with the Yugoslavian consulate, and proffered mitigation instruction and remand for a new penalty hearing.
I concur: SAITTA, J.
NOTES
[1] Kazalyn v. State, 108 Nev. 67, 825 P.2d 578 (1992), receded from by Byford v. State, 116 Nev. 215, 994 P.2d 700 (2000).
[2] 116 Nev. 215, 994 P.2d 700.
[3] Rippo v. State, 122 Nev. 1086, 146 P.3d 279 (2006); Garner v. State, 116 Nev. 770, 6 P.3d 1013 (2000), overruled on other grounds by Sharma v. State, 118 Nev. 648, 56 P.3d 868 (2002).
[4] Nika v. State, 113 Nev. 1424, 951 P.2d 1047 (1997).
[5] Nika v. State, Docket No. 27331, 113 Nev. 1641, 970 P.2d 1122 (Order Dismissing Appeal, December 30, 1997).
[6] Mann v. State, 118 Nev. 351, 354, 46 P.3d 1228, 1230 (2002).
[7] Evans v. State, 117 Nev. 609, 622, 28 P.3d 498, 508 (2001).
[8] Lara v. State, 120 Nev. 177, 179, 87 P.3d 528, 530 (2004).
[9] 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[10] Id. at 687-88, 104 S.Ct. 2052; Kirksey v. State, 112 Nev. 980, 987, 923 P.2d 1102, 1107(1996).
[11] Strickland, 466 U.S. at 694, 104 S.Ct. 2052; Thomas v. State, 120 Nev. 37, 43-44, 83 P.3d 818, 823 (2004).
[12] Riley v. State, 110 Nev. 638, 646, 878 P.2d 272, 278 (1994).
[13] Strickland, 466 U.S. at 697, 104 S.Ct. 2052.
[14] 116 Nev. 215, 994 P.2d 700 (2000).
[15] 503 F.3d 903 (9th Cir.2007).
[16] 116 Nev. 770, 6 P.3d 1013 (2000), overruled on other grounds by Sharma v. State, 118 Nev. 648, 56 P.3d 868 (2002).
[17] 1861 Laws of the Territory of Nevada, ch. 28, § 17, at 58; see also 1929 Nev. Compiled Laws, § 10068; NRS 200.030(1)(a).
[18] 96 Nev. 258, 263, 607 P.2d 576, 579 (1980).
[19] Compare The American Heritage Dictionary of the English Language 349 (1981) (defining "deliberate" as "[t]o consider (a matter) by carefully weighing alternatives or the like," "[p]remeditated; intentional," "[c]areful and slow in deciding or determining," "[n]ot rashly or hastily determined"), and Black's Law Dictionary 438 (7th ed.1999) (defining "deliberate" as "[i]ntentional; premeditated; fully considered" and "[u]nimpulsive; slow in deciding"), with The American Heritage Dictionary of the English Language 1033 (1981) (defining "premeditate" as "[t]o meditate or deliberate beforehand"), and Webster's Seventh New Collegiate Dictionary 671 (1969) (defining "premeditate" as "to think, consider, or deliberate beforehand"), and Webster's Third New International Dictionary 1789 (2002) (defining "premeditation" as "previous deliberation as to action; planning and contriving; forethought; consideration or planning of an act beforehand that shows intent to commit that act").
[20] Black's Law Dictionary 513-14 (4th ed. rev. 1968) ("`Deliberation' and `premeditation' are of the same character of mental operations, differing only in degree. Deliberation is but prolonged premeditation. In other words, in law, deliberation is premeditation in a cool state of the blood, or, where there has been heat of passion, it is premeditation continued beyond the period within which there has been time for the blood to cool, in the given case. Deliberation is not only to think of beforehand, which may be but for an instant, but the inclination to do the act is considered, weighed, pondered upon, for such a length of time after a provocation is given as the jury may find was sufficient for the blood to cool. One in a heat of passion may premeditate without deliberating. Deliberation is only exercised in a cool state of the blood, while premeditation may be either in that state of the blood or in the heat of passion.").
[21] 12 Nev. 414, 422-23 (1877).
[22] Id. at 416.
[23] Id.
[24] 15 Nev. 407, 414 (1880).
[25] Id. (emphasis added).
[26] 22 Nev. 336, 341-42, 40 P. 95, 96 (1895).
[27] 97 Nev. 529, 532, 635 P.2d 278, 280 (1981).
[28] Id.
[29] Id.
[30] See id. at 532-34, 635 P.2d at 280-81.
[31] 108 Nev. 67, 75, 825 P.2d 578, 583 (1992) ("Kazalyn argues that the jury instruction on premeditation is misleading because it does not distinguish between premeditation and malice aforethought."), receded from by Byford v. State, 116 Nev. 215, 994 P.2d 700 (2000).
[32] Id.
[33] 108 Nev. 700, 708-10, 838 P.2d 921, 927 (1992), vacated on other grounds, 511 U.S. 79, 114 S.Ct. 1280, 128 L.Ed.2d 1 (1994), receded from by Byford, 116 Nev. 215, 994 P.2d 700.
[34] 94 Nev. 422, 581 P.2d 5 (1978).
[35] 106 Nev. 843, 803 P.2d 218 (1990).
[36] 108 Nev. at 708-09, 838 P.2d at 927.
[37] Id. at 709-10, 838 P.2d at 927.
[38] See. e.g., Schoels v. State, 114 Nev. 981, 985, 966 P.2d 735, 738 (1998); Greene v. State, 113 Nev. 157, 168, 931 P.2d 54, 61 (1997), receded from by Byford, 116 Nev. 215, 994 P.2d 700; Evans v. State, 112 Nev. 1172, 1191-92, 926 P.2d 265, 278 (1996); Witter v. State, 112 Nev. 908, 918, 921 P.2d 886, 893 (1996), receded from by Byford, 116 Nev. 215, 994 P.2d 700; Doyle v. State, 112 Nev. 879, 900, 921 P.2d 901, 915 (1996), overruled on other grounds by Kaczmarek v. State, 120 Nev. 314, 91 P.3d 16 (2004).
[39] State v. Worley, 82 W.Va. 350, 96 S.E. 56, 58 (1918).
[40] Sanders v. State, 392 So.2d 1280, 1282 (Ala. Crim.App.1980).
[41] 44 Md.App. 71, 410 A.2d 17, 22 (Ct. Spec.App. 1979), abrogated on other grounds by Dishman v. State, 352 Md. 279, 721 A.2d 699 (1998); see Fuller v. State, 45 Md.App. 414, 413 A.2d 277, 280 (Ct.Spec.App. 1980).
[42] 410 A.2d at 22.
[43] Wilson v. State, 936 So.2d 357, 363 (Miss. 2006).
[44] 116 Nev. 215, 235, 994 P.2d 700, 713-14 (2000).
[45] 108 Nev. 700, 838 P.2d 921 (1992), vacated on other grounds, 511 U.S. 79, 114 S.Ct. 1280, 128 L.Ed.2d 1 (1994) receded from by Byford, 116 Nev. 215, 994 P.2d 700.
[46] 113 Nev. 157, 931 P.2d 54 (1997), receded from by Byford, 116 Nev. 215, 994 P.2d 700.
[47] Byford, 116 Nev. at 235, 994 P.2d at 713.
[48] Id. at 236 n. 3, 994 P.2d at 714 n. 3 (quoting Ogden v. State, 96 Nev. 258, 263, 607 P.2d 576, 579 (1980)).
[49] Id. at 235-36, 994 P.2d 700, 994 P.2d at 714.
[50] Id. at 234, 994 P.2d at 713.
[51] Id. at 233, 994 P.2d at 712.
[52] A conviction becomes final when the judgment of conviction has been entered, the availability of appeal has been exhausted, and a petition for certiorari to the United States Supreme Court has been denied or the time for such a petition has expired. Colwell v. State, 118 Nev. 807, 820, 59 P.3d 463, 472 (2002) (citing Griffith v. Kentucky, 479 U.S. 314, 321 n. 6, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)).
[53] 116 Nev. 770, 787, 6 P.3d 1013, 1024 (2000), overruled on other grounds by Sharma v. State, 118 Nev. 648, 56 P.3d 868 (2002).
[54] Id. at 789, 6 P.3d 1013, 6 P.3d at 1025.
[55] 479 U.S. at 328, 107 S.Ct. 708.
[56] Garner, 116 Nev. at 788, 6 P.3d at 1025.
[57] Id.
[58] Rippo v. State, 122 Nev. 1086, 1096-97, 146 P.3d 279, 286 (2006); Evans v. State, 117 Nev. 609, 643, 28 P.3d 498, 521 (2001).
[59] 503 F.3d 903 (9th Cir.2007).
[60] Id. at 909.
[61] Id. at 910 (quoting Byford v. State, 116 Nev. 215, 235, 994 P.2d 700, 713-14(2000)).
[62] Id. at 910-11.
[63] Id. at 911.
[64] Id. (quoting Francis v. Franklin, 471 U.S. 307, 316, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985)).
[65] Id.
[66] See Bunkley v. Florida, 538 U.S. 835, 839-40, 123 S.Ct. 2020, 155 L.Ed.2d 1046 (2003) (relying on state court's answer to certified questions as to whether state court interpretation of state criminal statute reflected change in rather than clarification of state law); Fiore v. White, 531 U.S. 225, 228, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001) (similar); accord Clem v. State, 119 Nev. 615, 622-25, 81 P.3d 521, 526-29 (2003) (discussing Bunkley and Fiore). See generally Justin Smith, Note, Post-Conviction Relief Under Florida Law: The Undue Process of the Evolutionary Refinement, 57 Fla. L.Rev. 653, 663 n. 86 (2005) (observing that the Pennsylvania Supreme Court's answer to the certified question in Fiore "was dispositive" and that "[b]asically, the question becomes a classification exercise, with the state court's categorization of the later decision determining whether a defendant will receive the benefit of retroactivity").
[67] Bejarano v. State, 122 Nev. 1066, 1075, 146 P.3d 265, 271 (2006); see Hubbard v. State, 112 Nev. 946, 948 n. 1, 920 P.2d 991, 993 n. 1 (1996).
[68] See, e.g., Schoels v. State, 114 Nev. 981, 985, 966 P.2d 735, 738 (1998); Greene v. State, 113 Nev. 157, 168, 931 P.2d 54, 61 (1997), receded from by Byford v. State, 116 Nev. 215, 994 P.2d 700 (2000); Evans v. State, 112 Nev. 1172, 1191-92, 926 P.2d 265, 278 (1996); Witter v. State, 112 Nev. 908, 918, 921 P.2d 886, 893 (1996), receded from by Byford, 116 Nev. 215, 994 P.2d 700; Doyle v. State, 112 Nev. 879, 900, 921 P.2d 901, 915 (1996), overruled on other grounds by Kaczmarek v. State, 120 Nev. 314, 91 P.3d 16 (2004).
[69] Byford, 116 Nev. at 235, 994 P.2d at 713.
[70] Garner v. State, 116 Nev. 770, 789, 6 P.3d 1013, 1025 (2000), overruled on other grounds by Sharma v. State, 118 Nev. 648, 56 P.3d 868 (2002).
[71] See, e.g., id. at 788, 6 P.3d at 1025 (stating that "[b]efore Byford was decided, our case law was divided on this issue"); id. at 789 n. 9, 6 P.3d at 1025 n. 9 (observing that the court's holdingthat Byford announced a "new requirement"  "does not mean ... that the reasoning in Byford is unprecedented" and that Byford "interprets and clarifies the meaning of a preexisting statute by resolving conflicting lines in prior case law" and thus "its reasoning is not altogether new").
[72] Bunkley v. Florida, 538 U.S. 835, 841-42, 123 S.Ct. 2020, 155 L.Ed.2d 1046 (2003).
[73] Id.
[74] Fiore v. White, 531 U.S. 225, 228-29, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001); Bunkley, 538 U.S. at 840-41, 123 S.Ct. 2020.
[75] See Rippo v. State, 122 Nev. 1086, 1096-97, 146 P.3d 279, 286 (2006); Evans v. State, 117 Nev. 609, 643, 28 P.3d 498, 521 (2001).
[76] 118 Nev. 807, 820, 59 P.3d 463, 472 (2002).
[77] 119 Nev. 615, 628, 81 P.3d 521, 531 (2003) (explaining that "on collateral review under Colwell... if [a rule] is new, but not a constitutional rule, it does not apply retroactively"); see also Gier v. District Court, 106 Nev. 208, 212-13, 789 P.2d 1245, 1248 (1990) (applying general rule that "[n]ew rules apply prospectively unless they are rules of constitutional law" and concluding that new rule announced in Sheriff v. Marcum, 105 Nev. 824, 783 P.2d 1389 (1989), was "not constitutionally mandated" and therefore "applies only prospectively").
[78] We disavow any language in Mitchell v. State suggesting that a new nonconstitutional rule of criminal procedure applies retroactively. 122 Nev. 1269, 1276-77 & n. 25, 149 P.3d 33, 38 & n. 25 (2006).
[79] 116 Nev. 770, 788, 6 P.3d 1013, 1025 (2000), overruled on other grounds by Sharma v. State, 118 Nev. 648, 56 P.3d 868 (2002).
[80] See People v. Whisenhunt, 44 Cal.4th 174, 79 Cal.Rptr.3d 125, 186 P.3d 496, 528 & n. 11 (2008) (recognizing separate definitions for terms "willful," "deliberate," and "premeditated" in first-degree murder instruction), cert. denied, ___ U.S. ___, 129 S.Ct. 638, ___ L.Ed.2d ___ (2008).
[81] See State v. Bush, 942 S.W.2d 489, 501 (Tenn. 1997) (concluding that "premeditation and deliberation are not synonymous terms," and "[w]hile the existence of both elements may be established by circumstantial evidence alone, premeditation requires proof of a previous intent to kill, while deliberation requires proof of a `cool purpose' that includes some period of reflection during which the mind is free from passion and excitement").
[82] Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Kirksey v. State, 112 Nev. 980, 987, 923 P.2d 1102, 1107 (1996).
[83] Doyle v. State, 116 Nev. 148, 156, 995 P.2d 465, 470 (2000); see Leonard v. State, 114 Nev. 639, 659-60, 958 P.2d 1220, 1235 (1998).
[84] Nika's claim that the district court erred by giving the Kazalyn instruction was appropriate for direct appeal, and we conclude that he failed to demonstrate good cause for his failure to raise it previously or prejudice because that instruction reflected the law at the time of his trial. See NRS 34.810(1)(b). We further reject Nika's claim that the district court's refusal to consider his challenge to the premeditation instruction resulted in a fundamental miscarriage of justice. See Pellegrini v. State, 117 Nev. 860, 887, 34 P.3d 519, 537 (2001). Accordingly, the district court did not err by summarily dismissing these claims.
[85] NRS 200.020.
[86] 116 Nev. 664, 666-67, 6 P.3d 481, 483 (2000).
[87] 103 Nev. 531, 534-35, 746 P.2d 1092, 1094-95 (1987).
[88] Id. at 535, 746 P.2d at 1094-95.
[89] Id. at 535, 746 P.2d at 1095.
[90] Id.
[91] Id. at 535-36, 746 P.2d at 1095.
[92] See Rudin v. State, 120 Nev. 121, 144, 86 P.3d 572, 587 (2004).
[93] Kirksey v. State, 112 Nev. 980, 998, 923 P.2d 1102, 1114 (1996).
[94] 112 Nev. 1434, 930 P.2d 719 (1996).
[95] Id. at 1440-42, 930 P.2d at 723-25.
[96] See Leonard v. State, 114 Nev. 639, 659-60, 958 P.2d 1220, 1235 (1998).
[97] Geary, 112 Nev. at 1440-41, 930 P.2d at 724.
[98] See, e.g., Leonard v. State, 117 Nev. 53, 80, 17 P.3d 397, 414 (2001); Sonner v. State, 114 Nev. 321, 324-26, 955 P.2d 673, 676 (1998).
[99] Leonard, 117 Nev. at 80, 17 P.3d at 414; Sonner, 114 Nev. at 324-26, 955 P.2d at 675-76.
[100] To the extent Nika argued that the district court erred by giving the executive clemency instruction, this claim was appropriate for direct appeal, and we conclude that he failed to demonstrate good cause for his failure to raise it previously or prejudice. See NRS 34.810(l)(b). Nika argues that even if Geary was not the law at the time of his trial, he should have been given the benefit of that decision on direct appeal. This court has held that a new rule applies to cases where a conviction is not final and before this court on direct appeal. See Clem v. State, 119 Nev. 615, 627, 81 P.3d 521, 530 (2003). However, even if Nika had challenged the clemency instruction on direct appeal under the reasoning in Geary, that case is factually distinguishable from Nika's case, and he is not entitled to relief. Therefore, the district court did not err by summarily dismissing this claim.
[101] Nika is apparently from Romania and spoke fluent Serbo-Croatian and only limited English.
[102] To the extent Nika argued that officials failed to contact the Yugoslavian consulate in violation of international law, this claim was appropriate for direct appeal, and we conclude that he failed to demonstrate good cause for his failure to raise it previously or prejudice. See NRS 34.810(1)(b). Therefore, the district court did not err by summarily dismissing this claim.
[103] Evans v. State, 117 Nev. 609, 634, 28 P.3d 498, 515 (2001); Hollaway v. State, 116 Nev. 732, 745, 6 P.3d 987, 996 (2000).
[104] 116 Nev. 732, 6 P.3d 987.
[105] In Evans v. State, we set forth an instruction to be given in future capital cases respecting the proper use of "other matter" evidence. 117 Nev. at 635-36, 28 P.3d at 516-17; see NRS 175.552(3).
[106] 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).
[107] Colwell v. State, 118 Nev. 807, 819-21, 59 P.3d 463, 471-72 (2002).
[108] 101 Nev. 782, 711 P.2d 856 (1985).
[109] Leonard v. State, 114 Nev. 1196, 1214, 969 P.2d 288, 299 (1998) (quoting Homick v. State, 108 Nev. 127, 138, 825 P.2d 600, 607 (1992)).
[110] To the extent Nika argues that trial counsel were ineffective for not requesting an instruction respecting the use of prior bad act evidence, we conclude that he failed to adequately explain how trial counsel's omission prejudiced him. Strickland v. Washington, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Kirksey v. State, 112 Nev. 980, 998, 923 P.2d 1102, 1114 (1996). To the extent Nika argues that the district court erred by failing to instruct the jury as he now proposes, we conclude that he failed to overcome applicable procedural bars. See NRS 34.810(1)(b). Therefore, the district court did not err by summarily dismissing these claims.
[111] 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).
[112] Id. at 377-80, 108 S.Ct. 1860.
[113] 114 Nev. 100, 105, 952 P.2d 431, 433 (1998).
[114] Jimenez v. State, 112 Nev. 610, 624-25, 918 P.2d 687, 695-96 (1996); see Geary, 114 Nev. at 104-05, 952 P.2d at 433.
[115] To the extent Nika argues that trial counsel were ineffective for not requesting his proposed instruction, we conclude that he failed to adequately substantiate his claim that trial counsel's performance was deficient or resulted in prejudice. Strickland, 466 U.S. at 687, 104 S.Ct. 2052; Kirksey, 112 Nev. at 987, 923 P.2d at 1107. Therefore, the district court did not err by summarily dismissing this claim.
[116] To the extent Nika argued that the district court erred by refusing to give his requested instruction respecting his lack of prior criminal history, this was a claim appropriate for direct appeal, and we conclude that he failed to demonstrate good cause for his failure to raise it previously or prejudice. See NRS 34.810(l)(b). Therefore, the district court did not err by summarily dismissing this claim.
[117] Nika v. State, 113 Nev. 1424, 951 P.2d 1047 (1997).
[118] Bejarano v. State, 122 Nev. 1066, 1074, 146 P.3d 265, 271 (2006).
[119] 118 Nev. 773, 781-82, 59 P.3d 440, 446 (2002).
[120] Nika, 113 Nev. at 1437, 951 P.2d at 1055.
[121] Id.
[122] Id.
[123] Leslie, 118 Nev. at 780, 59 P.3d at 445.
[124] Id. at 782, 59 P.3d at 446.
[125] See Nika, 113 Nev. at 1440-41, 951 P.2d at 1058 (Maupin, J., concurring).
[126] Nika contends that the district court erred by dismissing his claim that the death penalty is unconstitutional because (1) it is arbitrary; (2) the statutory aggravators are vague; (3) it achieves no societal or penological interests; and (4) it is cruel and unusual due to his lack of a criminal history, the absence of any evidence showing that he poses a danger "if incarcerated or not incarcerated," and the circumstances of the offense. He also contends that the district court erred by dismissing his claims that (1) the trial court erroneously refused to dismiss two jurors for cause, (2) two jury instructions given during the guilt phase diminished the State's burden of proof and erroneously redefined the jury's role, (3) the reasonable doubt and anti-sympathy instructions were improper, and (4) the State argued inconsistent theories of motive during the guilt and penalty phases. These claims are procedurally barred absent a demonstration of good cause for failing to raise them previously and prejudice, which we conclude Nika failed to show. See NRS 34.810(1)(b)(2). Nor did Nika adequately substantiate his argument that the denial of these claims on procedural grounds "would result in a fundamental miscarriage of justice." See Mazzan v. Warden, 112 Nev. 838, 842, 921 P.2d 920, 922 (1996). Consequently, we conclude that the district court did not err by summarily dismissing these claims. To the extent Nika argues that trial and appellate counsel were ineffective for not challenging any of these alleged errors, we conclude that he failed to adequately substantiate his claim that counsel were deficient or prejudice resulted. See Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Kirksey v. State, 112 Nev. 980, 987, 923 P.2d 1102, 1107 (1996). Therefore, the district court did not err by summarily dismissing these claims.
[127] 100 Nev. 498, 686 P.2d 222 (1984).
[128] Id. at 502-03, 686 P.2d at 225.
[129] Nika also argues that the district court ignored his motions for discovery and expert witness assistance and impeded his right to discovery during the post-conviction proceedings. He cites numerous matters that he alleges he should have been allowed to pursue and present to the district court. We have carefully reviewed Nika's allegations and conclude that he failed to substantiate his claim that the district court abused its discretion on the grounds he alleges. We further reject Nika's claim that the district court erred by dismissing his claim that the cumulative effect of all the alleged errors rendered his trial fundamentally unfair and his death sentence unreliable.
[130] Nika contends that the district court's orders resolving his postconviction petition were deficient because those orders did not comport with this court's directive in our opinion reversing the district court's summary dismissal of all but one of Nika's post-conviction claims of ineffective assistance of counsel. Nika v. State, 120 Nev. 600, 97 P.3d 1140 (2004). In that opinion, this court concluded that the district court's orders were deficient because they failed to include specific findings of fact and conclusions of law supporting its dismissal of the petition. Id. at 605, 97 P.3d at 1144. Although the district court's subsequent order does not provide the detailed factual findings and conclusions of law we prefer, the order is nonetheless sufficient to allow us to resolve Nika's claims based on the record before us.
[1] 112 Nev. 1434, 1440-42, 930 P.2d 719, 724-25 (1996).
[2] Id. at 1443, 930 P.2d at 725.
[3] Jimenez v. State, 112 Nev. 610, 624-25, 918 P.2d 687, 695-96 (1996).
[4] See Harris By and Through Ramseyer v. Wood, 64 F.3d 1432, 1438 (9th Cir. 1995) (concluding that prejudice under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), may result from cumulative deficiencies in counsel's performance); State v. Thiel, 264 Wis.2d 571, 665 N.W.2d 305, 322 (2003) (concluding that multiple incidents of deficient performance may be aggregated in determining prejudice under Strickland).